STANLEY BECK AND HELEN BECK, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 25003–82.     Filed October 10, 1985.

*Guy P. Lander* and *Leonard R. Glass*, for the petitioners.
*Gregg M. Weiss* and *Lewis R. Mandel*, for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in petitioners' Federal income tax of $41,293 for 1978 and $17,272 for 1979. After concessions by petitioners, the issues for decision are as follows: (1) Whether petitioner Stanley Beck's activity in connection with the publication of a certain book constituted an activity engaged in for profit, and (2) if so, whether a nonrecourse promissory note given as part of the consideration for rights to the book was a genuine indebtedness.[1] The parties raised various other issues which, in view of our holding herein, we need not and do not address.

---

[1] Parties in the following cases have agreed to be bound by the result in this case: Julius Kahn and Isabel Kahn, docket No. 25742–82; Jerry J. Jerome and Beverly E. Jerome, docket No. 9194–83; Edward Feldman and Janice Feldman, docket No. 9195–83; Louis Kawesch and Sheila Kawesch, docket No. 9196–83; Robert M. Rosen and Marilyn R. Rosen, docket No. 9197–83; Seymour Feldman, docket No. 22906–83; Florence Feldman Lubotta, docket No. 31746–83; and Seymour Feldman, docket No. 18675–84.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Stanley Beck (petitioner) and Helen Beck resided in Flushing, New York, at the time they filed their petition herein. They filed joint individual income tax returns for 1978 and 1979.

Since 1953 and during the years in issue, petitioner was a commercial artist and photographer whose primary clients were national television networks. Petitioner's art and photography activities did not involve any facet of the acquisition, production, or distribution of books or any other type of publication. Prior to 1978, petitioner had never purchased any book or publication for production and sale. In that year, petitioner's accountant and tax adviser, Robert M. Rosen (Rosen), suggested that petitioner acquire a book in the "Famous First Series" investment program offered by Contemporary Perspectives, Inc. (CPI).

CPI was a New York corporation engaged in the publishing and editorial development business. CPI created children's educational books and nonprint media for its own publication and for other publishers. Stephen P. Berner (Berner) and Arthur Rosenberg (Rosenberg) organized CPI in 1976 and were its principal officers and stockholders. Prior to forming CPI, Berner and Rosenberg were high-level executives with Random House, Inc. (Random House) and possessed considerable experience and expertise in educational publishing.

Soon after its formation, CPI was retained by the Baker & Taylor Co., a major book jobber, to organize a series of conferences for reading and education specialists, primarily librarians and teachers. In such conferences, which CPI conducted in various major U.S. cities, CPI presented the new educational publications of approximately 90 publishers. CPI also used the conferences to discover additional markets that it might exploit. Based upon conversations with persons attending the conferences, Berner and Rosenberg concluded that there existed a need for highly interesting yet easily readable nonfiction books to develop the skills of children with reading and language problems.

Berner and Rosenberg concluded that publishing such books would be particularly appropriate for a small company like CPI. They believed that the books would involve less risk and would provide more stable and longer-term returns than would aspiring "best sellers" and "blockbusters."

Berner and Rosenberg decided that CPI should publish the books in series, with each series centered around a particular theme. Through the assistance of education experts, CPI would control the reading difficulty of each book within a series.

After consulting various financial institutions, Berner and Rosenberg concluded that CPI would have difficulty obtaining conventional financing for development of the books. Moreover, they believed that establishing a significant presence in the market through the publication of many titles was important for a small, young company like CPI. Therefore, instead of retaining ownership of the books to be published, CPI decided to sell to investors the rights to the books in each series prior to publication and distribution of the books.

In 1977 CPI began publication of its first two series of children's books, "Unsolved Mysteries" and "Myths, Magic and Superstitions." Based upon the initial results of these two series, CPI was optimistic about the future of its children's books series.

In late 1977 or early 1978, CPI began development of its Famous First Series. The Famous First Series consisted of 25 titles conceived by CPI's editors, including "America's First Football Game," "First to the Moon," "The First Woman in Congress: Jeanette Rankin," and the book ultimately purchased by petitioner, "When TV Began: The First TV Shows" ("When TV Began").

After CPI's editors created each of the 25 titles, CPI contracted with various outside authors, many of whom had experience writing for children, to write the initial manuscripts for the books. The agreement between CPI and Sally Berke (Berke), chief of the Language Arts Department of "Readers' Digest" and author of "When TV Began," illustrates the typical arrangement CPI had with the outside authors. In the agreement, dated February 28, 1978, Berke agreed to research, write, and convey to CPI her entire interest in "When TV Began" in exchange for $500.

Upon receipt of the manuscript from an author, CPI reviewed the work and, based upon that review, might have the manuscript rewritten or restructured by a second writer. Employees of CPI then edited each book for language to assure proper readability and vocabulary levels.

Contemporaneously with the development of the books, CPI began a search for a distributor for the Famous First Series. After receiving bids from several distribution companies, CPI accepted the offer of Silver Burdett Co. (Silver Burdett), a subsidiary of Scott, Foresman & Co. and a large, highly respected publisher of educational books.

CPI and Silver Burdett entered into a written agreement dated May 26, 1978, in which CPI granted Silver Burdett the exclusive right to the hard cover library-bound English language edition of each book in the Famous First Series. Silver Burdett agreed to produce, at its own expense, not less than 5,000 copies of such edition for each book. If any title sold out, Silver Burdett undertook a similar obligation to reprint not less than 3,000 copies of the book. Silver Burdett further agreed to perform, at its own expense, all marketing services associated with the books, defined as "promoting, selling, advertising, billing, warehousing, fulfilling, shipping, collecting, bad debt risk, return handling, and all other appropriate customer services for distribution." CPI agreed not to publish a "trade or book club English language edition" of any of the Famous First Series books within 24 months after the date of the agreement. The agreement entitled CPI to royalties equal to 27.5 percent of the net receipts (gross sales revenues less returns) from the sales of the Famous First Series books by Silver Burdett, based on a list price of not less than $7.44 per book, reduced by discounts of 25 percent for sales directly to schools and libraries and 40 percent for sales to wholesalers. Silver Burdett agreed to pay CPI an advance against the above royalties equal to $3,500 per title on January 5, 1979. The agreement was to continue through June 30, 1982, and indefinitely thereafter unless Silver Burdett breached its obligations with respect to reprints or failed to sell at least 5,000 copies of each title by June 30, 1981.

After entering into the distribution agreement with Silver Burdett, CPI attempted to sell its rights in each of the Famous First Series books (subject to the distribution agreement) to

various unrelated investors. CPI ultimately sold approximately 20 or 21 of the 25 books to such investors. Only a few of the investors communicated directly with CPI. Instead, most of the investors either had previously invested in CPI books or were clients or colleagues of professionals with whom CPI did business.

Rosen was such a professional: in addition to being petitioner's accountant and tax adviser, he was the accountant for both CPI and Berner. Rosen had no expertise regarding the acquisition, production, publication, or distribution of books or other publications. He received a fee from CPI equal to approximately $1,500 for each of seven or eight investors, including petitioner, that he persuaded to purchase a book in the Famous First Series. Rosen purchased two of the books for himself.

Prior to presenting to petitioner the opportunity of investing in a Famous First Series book, Rosen examined several documents from CPI relating to the investment program. Among these was a document entitled "CONFIDENTIAL OFFERING MEMORANDUM" (the offering memorandum).[2] The offering memorandum provided that the purchaser of a book would acquire all rights in the book for $130,000, $30,000 in cash ($15,000 at closing and $15,000 (plus interest at 8½ percent per annum) on January 15, 1979) and $100,000 by 6-percent, 10-year nonrecourse promissory note. The purchaser would be required to prepay the note to the extent of 50 percent of all sums received by the purchaser from the distribution in the United States and Canada of the hard cover library edition of the book and 70 percent of all other revenues received by the purchaser. Payments on the note would be applied first to interest and then to principal. If the purchaser's share of the revenues from the book was insufficient to pay the note on or before its maturity, CPI's only remedy would be to foreclose upon its retained security interest in the book.

The offering memorandum described the distribution agreement between CPI and Silver Burdett, to which the purchaser's interest in the book would be subject, and an optional

---

[2]Petitioner was unable to produce for trial the offering memorandum with respect to "When TV Began." He nevertheless stipulated that the offering memoranda relating to Famous First Series books were identical in all material aspects. The record herein includes the offering memorandum with respect to "America's First Football Game."

distribution agreement between the purchaser and CPI. Under the latter arrangement, the purchaser could elect to appoint CPI as the exclusive distributor for all rights not subject to the agreement with Silver Burdett, and CPI would be entitled to a commission equal to 5 percent of all gross revenues received with respect to such rights.

The offering memorandum further provided, in relevant part:

This investment is available only to a purchaser whose net worth is at least $125,000, and some portion of whose annual gross income would be subject to Federal income tax at a rate of 50% or higher: or who has anticipated gross income during 1978 and 1979 in excess of $75,000 per year. See the acquisition agreement attached as an exhibit hereto with respect to certain representations and warranties which a purchaser will be required to make.

         \*        \*        \*        \*        \*        \*        \*

Leonard R. Glass, Esq., Special Counsel to Contemporary Perspectives, Inc., in connection with this memorandum, \* \* \* is available to answer questions of purchaser or his representative concerning any aspect of this offering.

         \*        \*        \*        \*        \*        \*        \*

1. An investment in the publication and other commercial exploitation of a literary property generally, and specifically in the field of children's books, is highly speculative and has historically involved a substantial degree of risk. Revenues, if any, are dependent upon the sales success of the Book and the successful exploitation of the subsidiary rights (non-publishing) of the Book. Sales appeal of the Book and related subsidiary rights depend upon factors such as (i) the efforts of the Distributor, including its willingness to expend monies on advertising and promotion (which is not mandatory under the terms of the Distribution Agreement), and to fulfill its other obligations under the Distribution Agreement with the Purchaser; and (ii) critical reviews in trade publications and industry reaction over which the Purchaser will have no control. Even if the Book is a critical or artistic success, there is no assurance that sufficient income will be realized in order to return Purchaser's investment.

         \*        \*        \*        \*        \*        \*        \*

Children's books are sold primarily to libraries and educational institutions. Public funding of both public libraries and educational institutions has been reduced in recent years as a result of general economic conditions and cuts in public funding. In the absence of a major increase in the funds available to fund public libraries and educational institutions, the primary market for the Book may be further restricted in the near future.

3. The Seller, which is in the publishing business, owns and will acquire other literary properties and intends to sell and/or distribute these literary

properties to other purchasers. Such purchasers may retain the Distributor to promote their books. To this extent, Seller and Distributor may be direct competitors of the Purchaser. The Purchaser and the Distributor will be in competition with other book publishers and distributors, many of which have substantially greater financial resources, larger distribution staffs and more established business histories in the book and literary properties business. In spite of these credentials, certain of these other companies have encountered financial difficulties which reflect the highly competitive character and unpredictability of public reaction to literary properties.

  *  *  *  *  *  *  *

It is anticipated that the primary sales of the Book will be to schools and libraries in the United States.

  *  *  *  *  *  *  *

The Purchaser should be allowed to amortize the cost of the Book by means of the "Income Forecast" method whereby cost (less estimated residual value) may be amortized on a weighted basis in accordance with anticipated revenue. * * *

Rosen also considered an opinion letter to CPI from Leonard R. Glass (Glass), who was to receive $3,000 from each investor's initial cash investment, which analyzed the tax consequences of an investment in a Famous First Series book. The letter stated that the investor should be able to use the income forecast method of depreciation, which the letter described as follows:

The "income forecast" method of depreciation attempts to allocate the taxpayer's cost for an asset based upon the flow of the income from the asset rather than upon the mere passage of time. Under this method of depreciation for a book, the owner of a book is allowed to depreciate the cost of the book (less a reasonable salvage value) over the period during which it is expected to produce income in proportion to projected realization of net receipts after distribution expenses for each taxable year over the period. Thus, the owner's depreciation deduction for any particular taxable year is equal to:

$$\frac{\text{Actual net receipts from the book in taxable year}}{\text{Estimated total net receipts to be derived during useful life}} \times \text{Cost of the book (less salvage value)}$$

Rosen examined an "appraisal" of "When TV Began" prepared by Brent Collins (Collins), then an executive with Random House. At the request of CPI, Collins prepared appraisals for each of the Famous First Series books. In the

"When TV Began" appraisal, as in each of the other appraisals, Collins projected total returns from all rights to the book (subject to the distribution agreement with Silver Burdett) equal to $243,700. Collins concluded that the life of the book would be 12 years and that $190,000 of the total projected returns would result from book sales. He predicted total returns from book sales to schools and libraries of $69,100, based upon the direct sale of 45,000 copies of the hard cover edition. Collins projected total unit sales of 278,000 copies. Collins determined his projections by adjusting preliminary figures supplied by Rosenberg, who forecasted total returns exceeding $300,000.

Rosen received from CPI and reviewed a document entitled "INVESTMENT REGARDING PURCHASE OF A NEW BOOK," which provided as follows:

POTENTIAL TAX BENEFITS AND CASH FLOW

| Year | Cash investment | Anticipated depreciation (A) | Cash flow (B) | Tax loss | Ratio of tax loss to investment (C) | Cash flow and net after tax saving (D) |
|------|-----------------|------------------------------|---------------|----------|-------------------------------------|----------------------------------------|
| 1978 | $15,000 | $49,400 | - - - | $49,400 | 3.29 to 1 | $9,700 |
| 1979 | 15,000 | 74,100 | $3,500 | 74,100 | 4.94 to 1 | 23,800 |
| 1980 | - - - | - - - | - - - | - - - | - - - | - - - |
| 1981 | - - - | - - - | - - - | - - - | - - - | - - - |
| Total | 30,000 | 123,500 | 3,500 | 123,500 | 4.1 to 1 | 33,500 |

(A) Computed on the income forecast method assuming a 5% salvage value. The above estimates are based upon assumptions as to estimated receipts from the Book in the taxable year and estimated total net receipts to be derived during its useful life. The depreciation to be taken will ultimately be based upon the actual performance of the Book in distribution and may differ significantly from the above estimates of such depreciation.

(B) The Distributor, Silver Burdett Company, has agreed to pay Purchaser a minimum guaranteed distribution fee of $3,500 on or before January 15, 1979. This payment will be subject to income taxes.

(C) The ratio of tax loss to investment does not give effect to the cash flow of $3,500. Assuming Purchaser is in a 50% tax bracket after Purchaser has paid taxes on the minimum royalty payment, the ratio of losses to cash investment will be increased from 4.1 to 1 to 4.3 to 1.

(D) Assumes that Purchaser is in a 50% tax bracket.

After reviewing the above documents, Rosen contacted Glass to discuss the tax benefits resulting from the purchase of a Famous First Series Book.

Rosen presented the Famous First Series investment opportunity to petitioner in November 1978. At that time, Rosen made available and explained to petitioner the documents that

Rosen had previously reviewed. In a letter to petitioner dated November 21, 1978, Rosen stated:

The recent change in the tax reform law will have dramatic implications on future "tax shelters". The book deal that we discussed the other day has been thoroughly analyzed by myself as well as independent tax attorneys. I am enclosing a copy of a letter from Mr. Leonard Glass as well as a letter of explanation from myself that was sent to several prospective investors.

I am sure you can see the merits of this as an investment as well as for tax shelter dollars. The $15,000 payment in 1978 which will provide you with a $49,000 tax deduction will represent significant dollars saved. The second and final installment is due in January, after a guaranteed payment of $3,500, also in the amount of $15,000. Therefore, your net cash outlay in 1979 is $11,500 with a deduction that year of $30,000.

As there are only 15 books presently available, I think it would be in your best interest to consider this for yourself * * *

Petitioner relied heavily upon Rosen's advice and contacted no one other than Rosen regarding the investment. A factor in petitioner's ultimate selection of "When TV Began" was his professional involvement in the television industry. Petitioner did not read "When TV Began" prior to his purchase of the book.

On December 18, 1978, petitioner and CPI executed all documents necessary to effect petitioner's purchase of "When TV Began" in accordance with the offering memorandum. These documents included a subscription agreement; a contract of sale (entitled "ACQUISITION AGREEMENT"); a check for the $15,000 payable at closing; a negotiable promissory note with respect to the $15,000 cash payment due January 15, 1979; a $100,000 nonrecourse promissory note; a bill of sale transferring all of CPI's rights in "When TV Began" to petitioner; and a security agreement and a financing statement evidencing CPI's security interest in "When TV Began." CPI formally transferred its copyright in "When TV Began" to petitioner on April 18, 1979.

Through an agreement dated December 18, 1978, petitioner exercised the option to make CPI the exclusive distributor for all rights to "When TV Began" not subject to the agreement with Sliver Burdett. In exchange for the 5-percent commission, CPI agreed to:

(a) Exert reasonable efforts to arrange for the disposition of the aforesaid rights in your behalf;

(b) Develop concepts based on the Work for use in the educational market;

(c) Consult with any purchaser of said rights concerning marketing, packaging, advertising and editorial development.

The agreement extended for 10 years and was automatically renewable thereafter for an additional 5 years, unless petitioner objected to renewal. Petitioner could cancel the agreement if he did not receive at least $60,000 in gross revenues (after deducting the 5-percent commission) from the exploitation of the rights subject to the agreement within the first 5 years of the agreement.

Petitioner, Rosen, and three other persons who purchased books in the Famous First Series entered into an agreement, dated December 15, 1978, which provided:

Any income derived from the sale of any of the books shall be deposited by each of the parties into a special account maintained by Rosen and shall be divided equally among all of the parties. In connection with each party's tax return, his tax return shall report his share of the income from the book owned by him even though his actual cash receipts may be less. However, to the extent that said party pays more in taxes than any of the other parties, then there shall be pro rata contribution from the other parties to make up the difference in the income taxes paid. * * *

On November 7, 1980, CPI entered into an agreement with Modern Curriculum Press (MCP) for the distribution of the soft cover classroom English language edition of 45 CPI titles, including the 25 Famous First Series books. In exchange for the exclusive distribution rights in the United States and Canada, MCP agreed to produce, at its own expense, not less than 5,000 copies of such edition of each book, and, if any title sold out, not less than 5,000 copies in reprint. MCP agreed to perform all marketing services associated with the books, defined as "promoting, selling, advertising, billing, warehousing, fulfilling, shipping, collecting, bad debt risk, return handling, and all other appropriate customer services for distribution." The agreement entitled CPI to royalties of 10 percent, 12.5 percent, and 15 percent of the net sales (gross sales revenues less returns) from the first 10,000 copies, the next 15,000 copies, and any additional copies, respectively, of each title. The agreement extended through June 30, 1984, and thereafter unless MCP breached its obligations with respect to reprints or failed to sell at least 10,000 copies of each title by June 30, 1984. At the time of the agreement, MCP

expected to sell 20,000 to 25,000 copies of each title over a 10-year period.

Silver Burdett and MCP sold copies of the hard cover and soft cover edition of "When TV Began," respectively, as follows:

| Year | Hard cover | | Soft cover |
|------|-----------|--|-----------|
| 1979 | 1,638 | | |
| 1980 | 1,526 | | |
| 1981 | 753 | | 135 |
| 1982 | 317 | | 2,998 |
| 1983 | 151 | | 2,827 |
| 1984 (through Sept.) | 543 | (Approx.) | 2,288 |
| Total | 4,928 | | 8,248 |

MCP sold the CPI titles that it distributed only within sets composed of 45 titles and priced at $69.99 each, and thus sales were identical for each of the Famous First Series books. Sales of "When TV Began" by Silver Burdett were above the average for all of the Famous First Series books.

CPI, Silver Burdett, and MCP engaged in reasonable efforts to promote the Famous First Series books and rights thereto. CPI spent approximately $23,500 to create "When TV Began" before turning the book over to Silver Burdett for producing the hard cover edition. The cost to Silver Burdett of manufacturing the Famous First Series books was $0.8359 per copy. Silver Burdett incurred total nonmanufacturing costs (exclusive of royalty payments under the distribution agreement with CPI) of approximately $160,900 with respect to the Famous First Series books through September 1984. MCP spent a total of $208,732 to produce and distribute the 8,248 sets of CPI books that it sold through September 1984. CPI did not engage any distributors other than Silver Burdett and MCP to distribute "When TV Began."

Petitioner and Rosen engaged in very little activity with respect to petitioner's investment in "When TV Began" after petitioner purchased the book. Petitioner never communicated with Silver Burdett and, as of the date of trial, was unaware that CPI engaged MCP to distribute the soft cover edition. Rosen's only contact with Silver Burdett was in connection with discrepancies in royalty payments.

Petitioner did not maintain any books, records, or separate bank accounts with respect to "When TV Began."

CPI's unaudited June 30, 1979, balance sheet, prepared by Rosen, did not report as assets the nonrecourse notes associated with the Famous First Series program. The notes accompanying the financial statements disclosed such nonrecourse notes as a "contingent asset."

In 1983, there were approximately 51,000 public elementary schools, 16,000 private elementary schools, and 15,000 public libraries in the United States. Like the other Famous First Series books, "When TV Began" was a "supplemental reader" and thus, unlike basic textbooks, was not a necessary item for schools and libraries.

Petitioners reported adjusted gross income of $134,285 and $146,234 on their income tax returns for 1978 and 1979, respectively. On Schedule C of their returns, petitioners reported net losses of $49,500 and $30,000 for the 2 years, respectively, in connection with petitioner's interest in "When TV Began." In neither return did petitioners report any income with respect to the book. The loss reported in 1978 consisted of $46,500 depreciation, based upon a reported cost basis of $130,000, and $3,000 legal and professional fees. The loss reported in 1979 consisted solely of depreciation, based upon a reported cost basis of $150,000. Petitioners filed an amended return for 1978 in which they claimed investment tax credit of $15,000 with respect to the book, based upon a reported cost basis of $150,000.

Respondent denied all deductions and investment tax credit associated with petitioner's interest in "When TV Began." Petitioners concede that the deduction for legal and professional fees was in error.[3]

Subsequent to the years in issue, petitioner purchased two additional books or book-related investments offered by CPI. Petitioners reported aggregate net losses with respect to these books of $38,821, $44,479, $40,639, and $15,515 on their tax returns for 1980, 1981, 1982, and 1983, respectively.[4] Petition-

---

[3]In the stipulation of facts, petitioners further conceded "all issues raised in the notice of deficiency other than disallowance of Schedule C losses claimed with respect to the book." Yet petitioners argue in their briefs that a portion of the purchase price was subject to investment tax credit, an item respondent disallowed in the notice of deficiency. Because of our holding herein, we need not determine the effect of petitioners' stipulation.

[4]We, of course, make no finding as to the validity of the losses reported in the subsequent years. As indicated in our opinion herein, however, in the context of the entire record, petitioner's additional investments are relevant for determining his intention with respect to "When TV Began."

ers did not report any income or deductions with respect to "When TV Began" on such returns.

## ULTIMATE FINDINGS OF FACT

Petitioner's activities in connection with "When TV Began" were not undertaken or carried out with an actual and honest objective of making a profit.

## OPINION

To qualify for the claimed depreciation deductions with respect to "When TV Began," petitioners must demonstrate that the book either was used in a "trade or business" or was held "for the production * * * of income" within the meaning of section 167(a).[5] Under section 48(a)(1), the investment tax credit is allowable only for property with respect to which depreciation (or amortization in lieu thereof) is allowable. Thus, petitioners' right to both depreciation deductions and investment credit depends upon their showing that petitioner's activity with respect to "When TV Began" either constituted a trade or business or was undertaken and carried on for the production of income. See *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983); *Pike v. Commissioner*, 78 T.C. 822, 841–842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984).[6]

Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Fuchs v. Commissioner*, 83 T.C. 79, 98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. *Zemel v. Commissioner*,

---

[5] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[6] Sec. 183 allows deductions to the extent of gross income with respect to an activity not engaged in for profit. See *Brannen v. Commissioner*, 78 T.C. 471, 499–500 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Because petitioners did not report any income with respect to "When TV Began" during the years in issue, they are entitled to no deductions under sec. 183.

734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. *Rosenblatt v. Commissioner*, 734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. *Krasta v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. *Leffel v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner*, 734 F.2d 5 (3d Cir. 1984). "The courts have used words such as 'basic,' 'dominant,' 'primary,' 'predominant,' and 'substantial' to describe the requisite profit motive." *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981). See also *Herrick v. Commissioner*, 85 T.C. 237, 254 (1985); *Flowers v. Commissioner*, 80 T.C. at 931. "Profit" in this context means economic profit, independent of tax savings. *Herrick v. Commissioner, supra*; *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983).

Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances.[7] *Elliott v. Commissioner*, 84 T.C. 227, 236 (1985), and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement of his intent. *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979); sec. 1.183–2, Income Tax Regs. Moreover, as discussed in greater detail below, the absence of a particular indicia of profit motive may be more significant to our determination that the superficial presence of another indicia. Respondent's determination is presumptively correct, and petitioners bear the burden of proving petitioner's profit objective. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Based upon the entire record, we conclude that petitioner did not engage in the "When TV Began" activity with an

---

[7] Sec. 1.183–2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulation are as follows:

(1) *Manner in which the taxpayer carries on the activity.* * * *

(2) *The expertise of the taxpayer or his advisors.* * * *

(3) *The time and effort expended by the taxpayer in carrying on the activity.* * * *

(4) *Expectation that assets used in activity may appreciate in value.* * * *

(5) *The success of the taxpayer in carrying on other similar or dissimilar activities.* * * *

(6) *The taxpayer's history of income or losses with respect to the activity.* * * *

(7) *The amount of occasional profits, if any, which are earned.* * * *

(8) *The financial status of the taxpayer.* * * *

(9) *Elements of personal pleasure or recreation.* * * *

actual and honest objective of making a profit but instead engaged in the transaction primarily, if not exclusively, to obtain tax deductions and credits and thereby reduce the tax petitioners would otherwise have to pay on their substantial income from other sources. Petitioners are therefore not entitled to the claimed depreciation deductions or investment tax credit.

The crux of petitioner's argument is that petitioner, a person unskilled in business and financial matters, reasonably relied upon others with respect to his investment in "When TV Began." Petitioners contend that the activities of Rosen and the distributors of the book, particularly CPI, indicate that petitioner possessed the requisite profit objective.

Petitioner testified that Rosen recommended "When TV Began" for both its economic and its tax benefits. Petitioner stated that his primary reason for purchasing the book was to acquire an asset that would produce income over a long term. We recognize that a prospective investor might seek and rely upon the advice of one possessing greater expertise in evaluating the economic merits of an investment. We are convinced, however, that Rosen, petitioner's tax adviser who possessed no expertise in publishing, recommended "When TV Began" to petitioner primarily for its tax benefits and that petitioner purchased the book primarily to receive those benefits.

In the November 21, 1978, letter to petitioner, Rosen recommended the purchase of a Famous First Series book "as an investment as well as for tax shelter dollars." The clear focus of that letter, however, was the "tax shelter dollars." Other than the above general reference to investment merits, Rosen made no mention in the letter of the economic benefits of the investment. By contrast, he described in detail the large expected tax deductions resulting from a relatively small cash investment, certified that the investment had been thoroughly analyzed by himself and independent tax attorneys, enclosed Glass' tax opinion letter, and alluded to the impact of tax reform on "future 'tax shelters.' " Based upon the entire letter, we must conclude that in advising petitioner, "it would be in your best interest to consider [purchasing a book]," Rosen recommended the investment as a golden and perhaps final opportunity to obtain the proffered tax benefits. Cf. *Estate of Baron v. Commissioner*, 83 T.C. 542, 555 (1984).

Petitioner contends that Rosen carefully reviewed the offering materials provided by CPI, and based thereon evaluated the economic merits of the investment. Petitioner predictably relies upon the appraisal prepared by Collins and projecting total returns from "When TV Began" of $243,700 over 12 years. The record does not indicate that Rosen was aware of the prior book investment programs offered by CPI and that CPI was optimistic concerning the success of the Famous First Series. The Collins' appraisal, however, constituted the sole specific economic forecast relating to the investment. It is improbable that petitioner and Rosen, both of whom were inexperienced in publishing, would have blindly relied upon an appraisal furnished by the seller, if they had given any serious consideration to the nontax investment merits of "When TV Began," particularly in light of the business risks detailed in the offering memorandum. See *Elliott v. Commissioner*, 84 T.C. at 240.

Indeed, the other documents provided by CPI and reviewed by Rosen and petitioner were so inconsistent with the appraisal to invite, at the very least, questions from a profit-motivated investor. The offering memorandum twice indicated that the primary sales of the book would be to schools and libraries, and yet Collins projected returns from such sales at $69,100, only approximately 36 percent of total returns from book sales. Because Collins assumed that the school and library sales would consist solely of the hard cover edition (which was more profitable than the soft cover edition), his unit sales projections were even more puzzling in light of the statements in the offering memorandum. Collins' forecast of 45,000 copies to schools and libraries represented only approximately 16 percent of the 278,000 total copies he expected to be sold.

In contrast to the Collins' appraisal, the document entitled "INVESTMENT REGARDING PURCHASE OF A NEW BOOK" projected cash flow, excluding tax benefits, of only $3,500, the amount of the advance royalty payable by Silver Burdett in 1979.[8] Like the November 21, 1978, letter from Rosen, the overwhelming majority of the "potential tax benefits and cash flow" detailed in the document were tax benefits. Moreover, the document

---

[8]Despite the implication in the document and in Rosen's letter to petitioner, CPI would be entitled to one-half of the advance royalty under the terms of the nonrecourse note. Berner testified that CPI received this amount and applied it against the note balance.

projected that the entire $130,000 purchase price, less 5-percent salvage value, would be fully depreciated during the first 2 years under the income forecast method, "based upon assumptions as to estimated receipts from the Book in the taxable year and estimated total net receipts to be derived during its useful life." Implicit in the depreciation projection, and explicit in light of the careful description of the income forecast method in both the offering memorandum and Glass' tax opinion letter, was the assumption that "When TV Began" would not provide any economic return after 1979.[9]

Whereas we would expect an investor motivated by profit and not possessing any publishing experience to seek additional information regarding these obvious yet fundamental warnings, inconsistencies, and omissions in the documents provided by CPI, the only action taken by Rosen or petitioner in this regard was Rosen's contacting Glass with respect to tax consequences. The objective evidence indicates that petitioner's primary motivation in purchasing "When TV Began" was to obtain the large tax benefits projected by CPI and Rosen. See *Herrick v. Commissioner*, 85 T.C. 237, 255–257 (1985).

In attempting to rely upon the activities of CPI and the other distributors to satisfy petitioners' burden of proving petitioner's profit objective, petitioners argue: "When determining the expertise of the taxpayer or his advisors and evaluating their efforts to exploit the investment property, the courts examine the expertise of the people in control of the investment, even if that person is the seller." Petitioners cite *Siegel v. Commissioner*, 78 T.C. 659 (1982); *Harrington v. Commissioner*, T.C. Memo. 1984–428, on appeal (3d Cir., Dec. 28, 1984); and *Reali v. Commissioner*, T.C. Memo. 1984–427, in support of their position. In those cases we did examine the expertise and efforts of independent parties, like CPI in the present case, engaged to promote and distribute the rights acquired by the taxpayers. See also sec. 1.183–2(b)(2), Income Tax Regs. That examination, however, was not our sole or even primary focus. In *Siegel*, for example, the investor partnership itself, through its general partner, engaged in substantial efforts to promote

---

[9]We express no opinion as to whether the income forecast method would be an appropriate method for computing depreciation with respect to "When TV Began." Nor do we attempt to resolve the dispute between the parties as to whether the method actually used by petitioners was the income forecast method.

the venture[10] and remained apprised of the efforts expended and results obtained by the independent distributor.[11]

In *Flowers v. Commissioner*, 80 T.C. 914, 932 (1983), we determined that a "passive" partnership did not possess the requisite profit objective and stated the applicable standard as follows:

Our inquiry is [not] confined solely to the activities of the partnership, for those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise. In such case, a partnership can rely upon the expertise of third parties by contractually assigning most of the normal duties and responsibilities associated with the income-generating operations to such parties. The scope of the relevant inquiry therefore expands to encompass the entirety of such multilayered transactions. See *Siegel v. Commissioner, supra* at 700–702; *Brannen v. Commissioner, supra* at 509–511. *However, the profit motive issue must still be assessed from the perspective of the partnership. Thus, where the partnership is virtually passive in its operations, the prudence it exercises in acquiring property and in assigning duties to third parties, and the care with which it oversees the performance of such duties are of heightened importance.* [Fn. ref. omitted. Emphasis supplied.]

Thus petitioners cannot satisfy their burden merely by pointing to the activities of CPI, Silver Burdett, and MCP. In determining petitioner's true intention, we must, as in *Flowers*, consider the objective evidence regarding his acquisition of "When TV Began" and his oversight of the distributors. As discussed above, petitioner's acquisition of "When TV Began" exhibited almost no concern for the nontax merits of the investment. As discussed below, petitioner's conduct, or lack thereof, after the purchase further indicates his almost total focus upon tax benefits.

Through September 1984, total hard cover and soft cover sales of "When TV Began" were 4,928 copies and 8,248 copies, respectively. Assuming that all sales of the hard cover edition were direct to schools and libraries and that Silver Burdett and MCP paid all royalties due petitioner, petitioner would have received a total of $8,762,[12] before payments on the

---

[10]Accord *Bizub v. Commissioner*, T.C. Memo. 1983–280.

[11]Accord *Harrington v. Commissioner*, T.C. Memo. 1984–428, on appeal (3d Cir., Dec. 28, 1984).

[12]Petitioner's receipts from hard cover sales would have been $1.53 per book (27.5 percent of $7.44 list price discounted 25 percent) or $7,540. Since "When TV Began" was 1 of the 45 titles in the $69.99 sets sold by MCP, petitioner's receipts from soft cover sales would have been $0.1482 per book (10 percent of $1.56 per title less 5-percent commission to CPI) or $1,222.

nonrecourse note to CPI. Although this amount receivable during the first 6 years of the investment is less than one-half of the average *annual* receipts projected by Collins and less than one-third of petitioner's cash investment, there exists no evidence that petitioner or Rosen contacted any of the distributors to ascertain why receipts were so low or whether efforts were being undertaken to improve the book's performance. Indeed, petitioner did not even know that CPI had engaged MCP to distribute the soft cover edition. Cf. *Elliott v. Commissioner*, 84 T.C. at 242–243. Tax motivations aside, petitioner's inaction is all the more puzzling, because each of the three distribution agreements either should have or could have been terminated for the failure to reach specified minimum unit sales or revenues.

Petitioner's inaction is quite easily explainable, however, if we consider the structure of the investment and his tax motivations. Unless and until petitioner realized sufficient revenues to satisfy the $100,000 nonrecourse note, petitioner's after-tax return would actually decrease as book sales increased. Petitioners' marginal tax rates exceeded 50 percent in both 1978 and 1979, and payments to CPI on the note would, depending upon whether hard cover or soft cover copies were sold, equal 50 percent or 70 percent of the receipts, respectively. See the analysis in *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983). Ignoring interest payments on the note and assuming all sales would be of the hard cover edition, payment of the note in full would require the sale of approximately 130,720 copies of the book,[13] well in excess of the 82,000 *total* elementary schools and public libraries in the United States.[14]

Petitioner did have some, perhaps indirect, contact with CPI after his investment in "When TV Began," as he purchased two additional books. We must conclude that petitioner was a

---

[13]The sale of 130,720 copies with receipts of $1.53 per copy would yield total receipts of $200,000, 50 percent of which would pay off the note. Substantially greater unit sales of the soft cover edition would be necessary to satisfy the note. See *supra* note 12.

[14]This aspect of the investment may also explain the Dec. 15, 1978, agreement among petitioner and the four other Famous First Series investors. Instead of an attempt to diversify downside risk (i.e., the risk that one of the books would not sell as well as the others), the purpose of the agreement may have been to mitigate the above consequences if one of the books *sold better* than the others.

satisfied customer of CPI who received what he wanted from "When TV Began."

We do not doubt that CPI, Silver Burdett, and MCP were respected experts in the publishing industry who exerted reasonable efforts to promote and distribute "When TV Began." Indeed, all three of the distributors earned a profit with respect to "When TV Began"[15] and CPI achieved the additional objective of establishing a presence in the market with the publication of the 25 Famous First Series titles. Because of petitioner's manifest indifference to economic profit, however, we simply cannot attribute to petitioner the motivations of the distributors. See *Estate of Baron v. Commissioner*, 83 T.C. 542, 554–555, 560 (1984); *Fuchs v. Commissioner*, 83 T.C. 79, 96–97 (1984); *Dean v. Commissioner*, 83 T.C. 56, 72–73 (1984). The following statement from *Estate of Baron* is equally applicable to the present case:

While we agree with petitioners that Casablanca [the distributor] was far more qualified than Baron to direct the promotion and sale of the album and that Baron would therefore have had very little to add to the sales campaign, we still believe that Baron's *complete* absence of contact with Casablanca can only be attributed to Baron's lack of concern with an economic profit. [83 T.C. at 560.][16]

Petitioners argue that petitioner conducted his activity with respect to "When TV Began" in a businesslike manner, as evidenced by the various agreements executed by petitioner and CPI. While we have concluded that the absence of such documentation indicated a lack of profit motive (see, e.g., *Fox v. Commissioner*, 80 T.C. at 1012), petitioners' argument exhalts form over substance to the extreme. The mere fact that petitioner and CPI signed the proper forms to establish petitioner's interest in "When TV Began" proves very little concerning his asserted profit motivation. We believe that

---

[15]The $25,500 net cash received from petitioner ($30,000 less $3,000 payment to Glass and $1,500 to Rosen) plus one-half of the $3,500 advance royalty from Silver Burdett alone yielded a profit on the $23,500 investment by CPI. The sale of 4,928 hard cover copies yielded $19,936 to Silver Burdett (4,928 times $7.44 list less 25 percent times .725 to reflect 27.5 percent royalty to petitioner) from a total investment of $10,555 in "When TV Began" (4.928 copies at $.8359 per copy manufacturing cost plus 1/25 of $160,900). MCP received $519,550 from the sale of 8,248 45-book sets (8,248 times $69.99 less 10 percent royalties to book owners) from a total investment of $208,732.

[16]Petitioners assert that Rosen, as CPI's accountant, monitored the activities of the distributors but presented no evidence to support this assertion.

petitioner's failure to maintain books, records, or separate bank accounts better illustrates his true objective with respect to "When TV Began." See sec. 1.183–2(b)(1), Income Tax Regs.

Petitioners contend that a number of unanticipated factors explain the ultimate lackluster performance of "When TV Began," primarily a decline in funding for public educational institutions. Cf. sec. 1.183–2(b)(6), Income Tax Regs. While several witnesses at trial verified this decline, the offering memorandum indicates that this trend had begun before petitioner purchased "When TV Began" and thus was not totally unexpected. Indeed, the reference to this trend in the offering memorandum merely represents another item about which we would expect petitioner to inquire before purchasing the book, if he were truly interested in nontax profits.

Where the taxpayer purchased an asset using nonrecourse indebtedness, we have often considered whether the fair market value of the asset approximated its purchase price in determining whether the taxpayer possessed the necessary profit objective. See, e.g., *Fox v. Commissioner*, 80 T.C. at 1009–1010; *Flowers v. Commissioner*, 80 T.C. at 937; *Siegel v. Commissioner*, 78 T.C. at 702–703; cf. sec. 1.183–2(b)(4), Income Tax Regs. We do not believe, however, that such an inquiry is particularly useful in the present case. The profit motive test requires a determination of the taxpayer's actual intent, based upon objective facts. *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); S. Rept. 91–552 (1969), 1969–3 C.B. 423, 489–490. Petitioner acquired "When TV Began" and supervised its publication and distribution with a manifest indifference to the book's value and profitability. Even if one knowledgeable about publishing would have considered $130,000 a fair price for "When TV Began" after a reasonable investigation, neither petitioner nor Rosen had such knowledge or conducted even a minimal investigation, despite the substantial "red flags" raised by the promotional material.

We have nevertheless considered the evidence presented with respect to the value of "When TV Began" and conclude that petitioners have failed to prove that such value approximated $130,000[17] on December 18, 1978. Petitioners argue

---

[17] Petitioners argue in their briefs and Rosenberg testified at trial that the true purchase price of "When TV Began" was less than $130,000, because the market interest rate for the $100,000

that Collins' "appraisal" should be accepted as the best evidence of the contemporaneous value of "When TV Began." Collins projected total returns of $243,700 from the book over 12 years, although he did not estimate the specific returns each year and thus did not actually compute a value for the book.

But the overwhelming majority of the receipts forecasted by Collins were from sources other than book sales to schools and libraries. Collins testified that he attributed significant weight to the reputation and expertise of Berner and Rosenberg, who at Random House "created * * * learning units, found whole new markets for trade books."[18] While Rosenberg testified that he estimated total returns in excess of $300,000, he provided no specific details with respect to his estimate.[19] Collins stated that his projections were consistent with the returns generated by Random House's "Landmark" series, but he offered no evidence that the Famous First Series was comparable to or could reasonably be expected to duplicate the results of Landmark. His brief testimony concerning Landmark indicated that it was a very exceptional series and that he examined the Landmark performance records "to see if the figures that Mr. Rosenberg and I were talking about were any

nonrecourse note was greater than the stated rate of 6 percent. Petitioners' argument is inconsistent with their reporting petitioner's cost basis in "When TV Began" as $130,000 and $150,000 on their 1978 and 1979 income tax returns, respectively. The logical conclusion from petitioners' argument is thus that they did indeed engage in an overvaluation with respect to "When TV Began." In any event, petitioners presented no reliable evidence of the market rate for the note and thus of its true value.

[18]Regarding expected receipts other than from sales to schools and libraries, Collins testified as follows:

These were the areas of markets that are nontraditional for publishers. The publishers generally do not go out and try to exploit. Book clubs to a certain extent, continuity sales, premium sales, filmstrip rights, movie and television rights.

These areas most publishers because they are simply not set up to exploit these rights for a book. [sic] I probably would not even have considered at that time except Mr. Rosenberg presented those to me as a real possibility.

When I learned that Mr. Rosenberg and Mr. Berner as CPI were going to act as agents for the book—

Q. You mean for rights other than Silver Burdett?

A. Yes, exactly.

That's the second point that they had negotiated the arrangement so that those rights were retained by the owner. I firmly agreed that these markets do, indeed, exist and that they should be exploited and I had every confidence after seeing Mr. Berner and Mr. Rosenberg in performance at Random House for all of those years that they would do their utmost to exploit these markets.

[19]We accept Rosenberg's testimony that the need for immediate cash the and unavailability of conventional financing prompted CPI to sell the Famous First Series books to investors. His testimony provided no support, however, for the $300,000 estimate or a fair market value of $130,000.

resemblance to reality."[20] Moreover, we refuse to ignore that the starting points for Collins' projections were the figures prepared by Rosenberg and that Rosenberg probably influenced Collins' "appraisal."

The record thus contains no specific, objective evidence establishing the value of "When TV Began" apart from the value resulting from anticipated sales to schools and libraries.[21] Even if we ignore the effect upon value of the timing of the receipts, "When TV Began" could generate receipts of $130,000 only through the sale of approximately 85,000 hard cover copies (at $1.53 per copy, see *supra* note 12), a figure in excess of the total elementary schools and public libraries in the United States.

Based upon the testimony of both petitioners' and respondent's valuation experts at trial, we believe such market penetration extremely unlikely, particularly for a supplemental reader like "When TV Began." Edward Stern, respondent's valuation expert, estimated the value of "When TV Began" as $15,000, based upon expected sales of 10,000 hard cover copies and 20,000 soft cover copies. Randall G. Marshall, petitioners' valuation expert, valued "When TV Began" at $59,500, based upon expected sales of 56,580 hard cover copies[22] and 25,000 soft cover copies.

In summary, it is apparent that bona fide business enterprises, like CPI in the present case, may find a sideline of marketing tax benefits to provide a useful means of raising venture capital. To some extent tax incentives, such as accelerated depreciation and investment tax credit, are designed to stimulate the formation of venture capital. Such

[20]Rosenberg similarly testified that his $300,000 estimate "was the pot of revenue, if you will, that a particular title *might* be able to generate." Emphasis supplied. Such speculation is not evidence of fair market value, i.e., what a reasonably informed purchaser would pay. See *Chiu v. Commissioner*, 84 T.C. 722, 733 (1985).

[21]Berner testified as follows:

Q. And what was that sales price based on?

A. It was based upon our best estimates as to the worth of the book. That estimate was arrived at principally by our financial officer, Mr. Rosenberg. And I tested it only to the extent that I knew the library market for such a book and believed that we could make it.

Q. In other words, you did not consider personally the evaluation of what we call the "ancillary rights" but, rather, the market that Silver Burdett was going after?

A. Yes. I could not have been expert enough to —I— there are few people who can be expert enough in the ancillary rights area.

[22]Marshall computed this figure as 60 percent of the 82,000 elementary schools and public libraries in the United States plus 7,380 copies to be sold in Canada.

incentives are not intended, however, to create a new economy consisting of paper transactions having no relationship to the real value of goods and services. Thus, the mere presence of a valid business enterprise at some levels of a transaction does not automatically entitle passive investors distant from day-to-day operations of the enterprise to the associated tax benefits. See e.g., *Estate of Baron v. Commissioner, supra; Flowers v. Commissioner, supra.*

Based upon the entire record, we conclude that petitioner did not possess an actual and honest profit objective with respect to "When TV Began." In light of our holding on this issue, we need not decide the second issue before us. The evidence of the fair market value of "When TV Began" is nevertheless insufficient to establish the validity of the nonrecourse note. See e.g., *Estate of Baron v. Commissioner,* 83 T.C. at 551–553; *Fuchs v. Commissioner,* 83 T.C. 79, 101–102 (1984); *Dean v. Commissioner,* 83 T.C. 56, 77–78 (1984).

*Decision will be entered for the respondent.*