FRANK BIZJAK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bizjak v. Commissioner
Docket No. 5787-89
United States Tax Court
T.C. Memo 1994-297; 1994 Tax Ct. Memo LEXIS 300; 67 T.C.M. (CCH) 3142; June 27, 1994, Filed *300 Decision will be entered under Rule 155. Frank Bizjak, pro se. For respondent: Patrick W. Turner. BUCKLEY
BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION BUCKLEY, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1985, together with additions to tax and increased interest, in the following amounts: Additions to Tax and Increased Interest Sec.
Sec.
Sec. Sec. Year
Deficiency
6653(a)(1)
6653(a)(2)
6661(a) 6621(c) 1985
$ 5,120
$ 256
[1]
$ 1,280
[2]
*301 After concessions, the issues remaining for decision are: [2] (1) Whether petitioner is entitled to a depreciation deduction on an energy management system; (2) if so, whether petitioner computed his depreciation deduction using the correct basis; (3) whether petitioner is liable for the addition to tax for negligence under section 6653(a)(1) and (2); and (4) whether petitioner is liable for increased interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. The *302 stipulation of facts and attached exhibits are incorporated herein by reference. At the time the petition herein was filed, petitioner resided in Redondo Beach, California. Frank Bizjak (hereinafter petitioner) has a degree in chemical engineering from Technical University in Graz, Austria, a B.S. in chemical engineering from Michigan Technical University, and a M.S. in chemical engineering from the University of Missouri. Petitioner worked for Intertec Design Inc. from 1983 through 1987, where he participated in the development of computer models which predict orbiter body and wing pressure environment during ascent and entry of flights. From 1974 to 1983, petitioner worked for the Energy Systems Group at Rockwell International, where he designed, developed, and tested various atmosphere control systems. Upon leaving his employment with Rockwell in 1983, petitioner received $ 60,000 and some Rockwell stock. [3] Petitioner recognized his need to invest his money and, when he was contacted in October or November of 1984 by Mr. Hoppe of Regency Financial Network, he began to explore potential investment opportunities. Mr. Hoppe suggested that petitioner invest in commodities, land, *303 or an energy management system. Petitioner viewed commodities as too risky and, although he was interested in the land investment, that opportunity never surfaced, and he began to explore seriously the opportunities available with the energy management system. Mr. Hoppe explained to petitioner that the energy management system was sold by a corporation called Sunbelt Energy Corp. (Sunbelt). Sunbelt was owned 30 percent by Murray Brooks and 70 percent by Phil Gardner. According to its sales brochure, Sunbelt was organized to manufacture and market an advanced solar-powered energy management system (system or equipment) which, by controlling air conditioning, heating, and refrigeration, would result in energy savings by commercial enterprises. Sunbelt claimed that the energy management system would reduce *304 a business' annual utility bill by 20 to 30 percent. An investor derived income directly from the savings generated by the system to the business, usually at the rate of 50 percent. Sunbelt offered each system at a purchase price of $ 25,500; with $ 7,500 down and the remainder of the purchase price evidenced by an $ 18,000 nonrecourse, 15-year note bearing interest at the rate of 9 percent. In addition, each investor had to pay a one-time installation expense of $ 2,500. Sunbelt had paid only $ 2,500 for each system, but petitioner did not know Sunbelt's cost for the system. Each purchaser also entered into a Purchase and Security Agreement whereby "Buyer hereby conveys and transfers to Seller a security interest in the System, and in all proceeds derived from the sale or use thereof as security for the payment and performance of Buyer's obligation's hereunder." The sales brochure set forth the anticipated tax benefits for purchasing a system as follows: (1) 10-percent Federal investment tax credit; (2) 15-percent Federal business energy tax credit; (3) 25-percent California solar tax credit; and (4) 5-year depreciation allowances. The brochure stated that a purchaser would *305 receive in the first year $ 12,750 in tax credits (half of the stated $ 25,500 purchase price) and depreciation allowances of $ 3,664, all for the initial cash expenditure of $ 10,000. On December 1, 1984, petitioner purchased one system from Sunbelt through Mr. Hoppe and Regency Financial Network. [4] Typically, when an individual purchased a system, Sunbelt provided a service company to locate a user for the system, to install the system, to monitor the energy consumption, and to collect and remit any gross receipts derived from energy savings. Petitioner entered into a service agreement with United States Energy Management Systems, Inc. (USEMS), which agreed to perform the duties listed above on petitioner's behalf. USEMS was entitled to 15 percent of petitioner's income from the user's energy savings. Petitioner then paid the one-time installation fee of $ 2,500 to USEMS. *306 Petitioner carefully reviewed the information about Sunbelt provided by Mr. Hoppe, including the sales brochure, purchase order, purchase and security agreement, and service agreement. In particular, petitioner gave substantial weight to the fact that Murray Brooks, president and 30-percent shareholder of Sunbelt, who had a B.S. in electronic engineering, had worked for 16 years in engineering and program management. Specifically, petitioner considered Murray Brooks' engineering experience on the Apollo Spacecraft Program at Rockwell International, a program with which petitioner was very familiar, representative of the quality of the investment and of those who put it together. Petitioner was aware that Mr. Hoppe was a financial adviser, with no previous experience as an engineer or with this type of energy management system. However, because of petitioner's engineering experience in general and with energy conservation techniques specifically, petitioner was confident that purchasing a system such as this one could produce a profit. To evaluate the system's profit potential, petitioner critiqued Sunbelt's cash flow projections and computed his own cash flow projections using *307 a discounted cash flow analysis. After analyzing potential cash flows, petitioner concluded that a profit could probably be realized in the long run. Petitioner did not seek an independent appraisal of the system but testified he believed himself sufficiently familiar with similar systems and their cost during 1984 and felt that the purchase price was not unreasonable. Petitioner was wrong. He had never examined the equipment in question. Prior to entering into this transaction, petitioner who was familiar with the use and operation of computers, did not inspect the equipment. The record does not indicate that he made any particular attempt at such inspection. He was apparently satisfied with the statement of Mr. Hoppe that the equipment was in storage. Further, petitioner made no attempt at obtaining an independent appraisal of the property, nor did he enquire about the name of the manufacturer of the equipment. All that he knew was that it was assembled in California. He apparently knew nothing about who manufactured the components of the system. Thus, he relied entirely upon the word of Mr. Hoppe and the representations in the brochure. Petitioner's system was not installed *308 prior to the end of 1984 as required by the agreement. Rather, he received a letter from USEMS confirming installation as of March 5, 1985, at a Mexican restaurant in Long Beach, California. Petitioner wanted to see his equipment functioning at its designated location, but was discouraged from doing so until August of 1985, when he waited at the restaurant for several hours before being given access to the system. He believed the equipment was operating properly. He did not have an opportunity, even then, to inspect the equipment thoroughly. All that he could testify to was that it was a 17" x 17" x 7 box with two cables. He did not inspect the solar panels and batteries on the roof. Petitioner subsequently attempted to verify that his system was operating properly. He called the restaurant in the spring of 1987 and was advised that the equipment was there but not functioning. Later, he went to the restaurant, but it was closed and out-of-business. Even later, the building disappeared. Petitioner later learned that USEMS had contracted with another company to install and maintain his equipment, and that problems existed between Sunbelt and USEMS. After filing a consumer *309 complaint against USEMS, petitioner abandoned his equipment late in 1986 or 1987. Petitioner is an intelligent, well-educated and sophisticated person. We find it difficult to believe that he entered into the Sunbelt transaction for anything other than the projected tax benefits. He had the capability to examine the equipment personally and to consider its programming, but he failed to do so. Further, while petitioner knew and was aware of the cost of some computers utilized at his work, he did not know enough about the Sunbelt equipment to begin to be able to make any comparative analysis of its value. For purposes of his cashflow projections, petitioner simply accepted the words of Mr. Hoppe and the sales brochure. We are unable to conclude that petitioner entered into this transaction with an honest profit objective. OPINION Respondent disallowed petitioner's depreciation deduction for the taxable year 1985 by asserting that petitioner did not purchase the equipment with the requisite profit objective. Respondent also determined that petitioner was liable for an addition to tax for negligence and for increased interest under section 6621(c). Petitioner argues that he *310 is entitled to depreciation of his energy management system because he invested in it with a profit objective, and that the negligence penalty should not apply because he exercised reasonable care when making this investment. Petitioner bears the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Depreciation.Section 167(a) allows a depreciation deduction for the exhaustion and wear and tear of property used in a trade or business or held for the production of income. [5] *312 To depreciate his energy management system, petitioner must demonstrate that he held it with the primary intention and motivation of making a profit. Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976); Leonard v. Commissioner, T.C. Memo. 1993-472; Langlois v. Commissioner, T.C. Memo. 1988-415, affd. without published opinion 886 F.2d 1316 (6th Cir. 1989). Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that petitioner entered into the *311 activity with an actual and honest profit objective. Beck v. Commissioner, 85 T.C. 557, 569 (1985); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1204 (D.C. Cir. 1983). When determining whether an actual and honest profit objective exists, the Court examines all the facts and circumstances, giving greater weight to objective facts than to petitioner's statement of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a) and (b), Income Tax Regs. The regulations list nine nonexclusive factors relevant to the issue of profit objective.[6] However, no one factor is controlling. Sec. 1.183-2(b), Income Tax Regs.
Based upon the record, we hold that petitioner did not purchase the equipment with an actual and honest objective of making a profit. Unlike the typical investor, petitioner was intimately familiar with the technical manner in which an energy management system, set up to reduce the cost of air conditioning, heating, and refrigeration, could provide energy savings to a commercial business owner. Petitioner spent a large portion of his career designing, developing, *313 and testing atmosphere control systems and testified that he believed that by purchasing this system he could profit from the energy savings the system could provide. We note, however, that petitioner did not have any particular expertise about the cost of such systems, nor did he seek such expertise. Petitioner evaluated his investment by evaluating the cash flow projections provided by Sunbelt and by producing his own discounted cash flow analysis. Petitioner, based on his limited knowledge, felt the purchase price was reasonable, but he had nothing to support this belief. Petitioner may have hoped for substantial energy conservation over the long-term, but we believe he mainly hoped for substantial tax savings. Petitioner failed to explain to the Court why he continued with the project when Sunbelt failed to keep its promise that the equipment would be installed and operating during 1984. Petitioner later took an active role with respect to his equipment. He expended some time and energy attempting to physically view the system and to insure to his satisfaction that it was working properly. In fact, it was through petitioner's persistence that he learned that Sunbelt and *314 USEMS were at loggerheads and that USEMS had subcontracted out the installation of his equipment. Soon after learning of these events, petitioner filed a formal complaint against USEMS. However, these are things that he did after entering into the transaction and after filing his 1985 return. Petitioner's earnings as an engineer do not fit the typical profile of someone that invests purely to shelter income without a profit objective. The $ 60,000 that petitioner received in 1983 from Rockwell exceeded his wages for the year in issue. We believe petitioner's subjective goal was to profit from his investment, but a substantial part of the way in which he expected to profit was through tax considerations. We do not believe that petitioner entered into the transaction with an honest and actual profit objective. Petitioner is not entitled to the deduction for depreciation. [7]
*315 Negligence. Section 6653(a)(1) imposes an addition to tax if any portion of an underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence under section 6653(a) is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner maintains that he exercised reasonable care when he invested in and depreciated the energy management system because his experience with similar systems enabled him to objectively evaluate the financial merits of the investment. We do not agree. We find it incredible that petitioner, a chemical engineer with extensive experience in computer models for the Rockwell shuttle programs, would invest in a piece of equipment about which he knew so little. Petitioner is an intelligent and educated taxpayer who, after receiving a fairly large amount of money, decided to make an investment. He did so with little *316 interest in the equipment. We cannot agree that he exercised due care in claiming this amount on his 1985 return, and hold that he was negligent in so doing. Section 6661(a). In view of respondent's concession regarding the Zond Energy issue, it is apparent that the provisions of section 6661(a) will not be applicable. Increased Interest. Section 6621(c), formerly section 6621(d), provides for an increased interest rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year attributable to a tax-motivated transaction. The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date section 6621(c) was enacted. Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The term tax-motivated transaction includes a transaction where any loss was disallowed by reason of section 465(a) or a transaction which is devoid of economic substance and without a profit objective. Sec. 6621(c)(3); Larsen v. Commissioner, 89 T.C. 1229 (1987), *317 affd. in part and revd. in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). This transaction was devoid of economic substance. We hold petitioner liable for increased interest under section 6621(c), if upon computation of his liability under the Sunbelt investment his underpayment is greater than $ 1,000. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year at issue; Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on the deficiency.↩
2. The annual rate of interest under sec. 6621(c) is 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to a tax-motivated transaction.↩
2. The parties entered into a Stipulation of Settled Issues regarding determined deficiencies resulting from an investment in the Zond Wind System and, as a result of the stipulation, respondent completely conceded that issue so that petitioner is entitled to a $ 7,173 deduction from his investment in Zond Energy, and no additions to tax apply to that investment under secs. 6653(a)(1) and (2) and 6661. Further the parties agree that there is no increased interest under sec. 6621(c) in regard to Zond.↩
3. It is possible that the $ 60,000 represented pension benefits, as petitioner stated at trial that he was entitled to 10-year averaging during those years. He referred to the amount received as his "savings".↩
4. Petitioner made the $ 7,500 cash downpayment on the system and the one-time installation fee of $ 2,500. Petitioner never made any principal payments on the $ 18,000 note he executed for the purchase of the equipment. The record does not indicate that he ever received any income from the system.↩
5. Respondent maintains that even if petitioner is entitled to depreciate the equipment, his depreciation deduction must be computed based only on petitioner's $ 7,500 downpayment, exclusive of the nonrecourse note. Petitioner included the $ 18,000 nonrecourse note as part of his basis for depreciation purposes.↩
6. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.↩
7. Even if petitioner were entitled to the deduction for depreciation, the amount of depreciation would be much less than claimed. Sec. 167(a) allows a deduction for depreciation for the exhaustion and wear and tear of property used in a trade or business or held for the production of income. Sec. 465 limits deductions so related to the amount for which petitioner is at risk. Sec. 465(a)(1), (c)(3). Amounts considered at risk include money and property contributed to an activity and amounts borrowed, if the taxpayer is personally liable for repayment or has pledged property (other than property used in the activity) for the amount borrowed. Sec. 465(b). However, borrowed amounts are not at risk to the extent that such amounts are protected against loss through "nonrecourse financing, guarantees, stop-loss agreements, or other similar arrangements." Sec. 465(b)(4). Although petitioner failed to have the note available for trial, he does agree that it was nonrecourse in nature. Accordingly, were petitioner allowed depreciation, his basis for purposes of depreciation is $ 10,000 consisting of his down-payment of $ 7,500 and the installation costs of $ 2,500.↩