HAROLD M. PROVIZER AND JOAN PROVIZER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Provizer v. Commissioner
Docket No. 27141-86.
United States Tax Court
T.C. Memo 1992-177; 1992 Tax Ct. Memo LEXIS 191; 63 T.C.M. (CCH) 2531; T.C.M. (RIA) 92177; March 25, 1992, Filed *191 Decision will be entered for respondent During 1981, Ps purchased a second-tier partnership interest in a sale-leaseback transaction structured around plastics recycling equipment. The partnership here is one of a group of plastics recycling transactions which initially had been planned to take advantage of tax credits and deductions. Subsequently, appropriate product and marketing were developed as a framework for the tax and financial design. The initial transaction planning had been modified in an effort to take advantage of the newly enacted safe-harbor leasing provisions. 1. Held, the transaction here in issue is so lacking in economic substance that it is disregarded for Federal income tax purposes and respondent's determination of deficiency in tax is sustained. 2. Held further, respondent's determination of additions to tax under secs. 6653(a) and 6659, I.R.C., are sustained. 3. Held further, respondent's determination of increased interest on tax-motivated transactions under sec. 6621(c), I.R.C., is sustained. Bernard S. Mark, Richard S. Kestenbaum, and Deborah S. Hack, for petitioners. Mary Hamilton and Michelle J. Gormley, for respondent. *192 FAY, WOLFE
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the SpecialTrial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: Respondent determined a deficiency of $ 17,724 in petitioners' joint Federal income tax for 1981 and additions to tax for that year in the amount of $ 4,317 under section 6659 for valuation overstatement, in the amount of $ 886 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on the underpayment attributable to negligence. Respondent also determined that interest on deficiencies *193 accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). This case has been tried and briefed as a lead case for limited partners in programs involving the leasing of Sentinel Recyclers which sometimes are referred to as Plastics Recycling programs. Plastics Recycling programs involved the promotion of expanded polyethylene (EPE) recyclers during 1981 and expanded polystyrene (EPS) recyclers during 1982. Petitioners in the instant case are only representative of investors in 1981 partnerships and the machines are only representative of Sentinel EPE Recyclers. Petitioners in approximately 250 docketed cases participated in Plastics Recycling programs by investing either in Sentinel EPE Recyclers in 1981 or Sentinel EPS Recyclers in 1982 or both. Some of the parties in these docketed cases have executed stipulations in which they have agreed to be bound by the outcome of this litigation with respect to all deductions, credits, additions to tax, and increased rate of interest resulting from their investment in the Sentinel Recyclers. In addition, respondent has indicated that approximately 1,600 undocketed cases involve Plastics *194 Recycling issues. In Greene v. Commissioner, 88 T.C. 376 (1987), this Court denied petitioners' motion for summary judgment and held that the safe-harbor leasing rules of section 168(f)(8) do not prevent the application of the sham transaction doctrine to the Plastics Recycling programs of which the safe-harbor lease was merely a part. The remaining issues for decision are: (1) Whether the Sentinel EPE Recycler leasing programs constitute a series of sham transactions lacking in economic substance; (2) whether petitioners are entitled to investment tax credits allegedly passed through to them by the Clearwater Group (Clearwater), lessee and licensor of the recyclers; (3) whether the Plastics Recycling programs comply with all of the requirements of section 168(f)(8) and are entitled to the benefits of the safe-harbor lease provisions; (4) whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules and regulations and for 50 percent of the interest attributable to negligence; (5) whether petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable *195 to valuation overstatement; and (6) whether petitioners' transactions in the Sentinel EPE Recycler leases were tax-motivated transactions to which interest at 120 percent of the statutory rate would apply, pursuant to section 6621(c). For convenience, the outline of our findings and opinion is set forth below: CONTENTS
FINDINGS OF FACT
5
I.
Background
6
A.   Petitioners and Other Persons
6
Petitioners Harold M. Provizer and Joan Provizer,
and also David Lichtenstein, Fred Gordon,
Samuel L. Winer, Harris W. Freedman, Raymond
Grant, Richard Roberts, Elliot I. Miller, John Y.
Taggart, John D. Bambara, and Robert Gottsegen
B.   The Entities Involved
10
Packaging Industries Group, Inc., Ethynol
Cogeneration, Inc., F & G Equipment Corp.,
Clearwater Group, and First Massachusetts
Equipment Corp.
II.
The Transaction or Deal
13
A.   Planning and Development of the Deal
13
B.   Development of a Machine to Fit Requirements
of the Deal
18
III.
What Really Happened Under the Framework
of the Transaction or Deal
21
A.   The Investment, the Partnerships, and the Simultaneous Transfers
21
B.   Operation of the Sentinel EPE Recyclers
28
IV.
Machines for Recycling Plastic Which Were Available
on the Open Market in 1981
30
A.   Buss-Condux Plastcompactor
30
B.   Nelmor/Weiss Densification System (Regenolux)
31
C.   Cumberland Granulators
31
D.   Foremost Densilator
31
V.
Expert Opinions
32
A.   Petitioners' Experts
32
1. Donald N. Merino
32
2. James D. Fogarty
34
3. Robert F. Staats-Westover and Leonard Sansone
35
4. Albert Spaak
36
5. Samuel Z. Burstein and Stanley Ulanoff
37
B.   Respondent's Experts
38
1. Garth Saloner and Janusz Ordover
38
2. Steven Grossman
38
3. Richard S. Lindstrom
39
ULTIMATE FINDINGS OF FACT
40
OPINION
40
I. Preliminary Matters
40
II. The Transaction or Deal in Issue Here Is a Sham
42
A. The Deal Lacks Economic Substance
45 1. Equity Interest
46 2. Opportunity for Economic Success
55
B. The Deal Lacks Business Purpose
57
III. The Safe-Harbor Leasing Rules
64
IV.
Investment Tax Credit and Business Energy Credit
64
V. Additions to Tax
65
A. Sec. 6653(a) Negligence
65
B. Sec. 6659 Valuation Overstatement
67
VI. Sec. 6621(c) Tax-Motivated Transactions
68
*196 FINDINGS OF FACT Some of the facts have been stipulated, and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Our use of terms such as purchase, recycle, sale, sale-leaseback, lease, license, sublicense, note, and transaction to describe the events is not necessarily to be construed as a finding that the transactions so described had economic substance. I. Background
A. Petitioners and Other Persons
Petitioners Harold M. Provizer and Joan Provizer resided in Farmington Hills, Michigan, when they filed their petition. During taxable year 1981, petitioner Harold M. Provizer (petitioner) was a practicing attorney and a member of the Michigan law firm of Provizer, Eisenberg, Lichtenstein, and Pearlman, P.C. His spouse, petitioner Joan Provizer, was not employed outside the home during 1981. Petitioners' gross income for 1981 from wages, interest, dividends, tax refunds, and capital gains was in excess of $ 190,000 and, consequently, in the absence of substantial deductions or credits, they were subject to payment of Federal income taxes in large amounts. Petitioner is a limited partner in DL and Associates which is a limited *197 partner in the Clearwater limited partnership. The losses and tax credits at issue in this case were passed through both of the limited partnerships to petitioner. David Lichtenstein (Lichtenstein) is a member of the law firm of Provizer, Eisenberg, Lichtenstein, and Pearlman, P.C. and is a partner in DL and Associates. Fred Gordon (Gordon) is an attorney who holds a master's degree in business administration and who at one time was employed by the Internal Revenue Service. Prior to the date of the Clearwater private placement offering, Gordon had considerable experience involving the evaluation of tax shelters, including formulating opinions regarding the tax shelters' economic vitality, the profit motives involved, and the valuation of the product involved. In 1981, Gordon was of counsel to Provizer, Eisenberg, Lichtenstein, and Pearlman, P.C. He recommended investing in the Clearwater offering to petitioner and his colleagues, as well as to some of Gordon's other clients. Gordon was paid a fee in the amount of 10 percent of each investment he guided to Clearwater. Gordon and Lichtenstein have known each other since childhood and at one time were associated in law practice. *198 Samuel L. Winer (Winer) is an investor, investment banker, and consultant with offices in Clearwater, Florida. Winer is the general partner in a number of limited partnerships which leased Sentinel EPE Recyclers, including Clearwater, Poly Reclamation Associates, Sunbelt Group, Southeast Recovery Associates, and Esplanade Associates. Winer paid $ 1,000 for a 1-percent interest in all items of income, gain, deduction, loss, and credit arising from the operations of Clearwater. For his services, Winer received $ 60,000 out of the proceeds of the Clearwater private offering. Harris W. Freedman (Freedman) is a licensed certified public accountant in New York who is highly experienced with leveraged leasing. Freedman was the president and chairman of the board of F & G Equipment Corp. (F & G). He is also the named partner in H.W. Freedman and Co., the accounting firm which prepared the partnership returns for Ethynol Cogeneration, Inc. (ECI), F & G, and Clearwater. Although Freedman's firm did not prepare the initial financial projection included in the offering memorandum, Freedman did review the financial projections and made suggestions as to both format and substance. Freedman *199 owned 94 percent of an EPE recycler. Raymond Grant (Grant) was a New York investment banker, attorney, and accountant during the year at issue. Formerly, Grant was employed as general counsel and senior vice president at Wadell & Reed, a large mutual fund sales organization. Grant is the president and 100-percent owner of the stock of ECI. Grant was a client of Freedman's firm and had worked with Freedman on a number of equipment leasing deals. Grant became friendly with Stanley Ulanoff after they met on a cruise and was instrumental in the hiring of Stanley Ulanoff as an evaluator of the Plastics Recycling programs. At the time of trial, Grant was retired. Richard Roberts (Roberts) is a businessman and the general partner in a number of limited partnerships which leased Sentinel EPE Recyclers. Roberts also is a 9-percent shareholder in F & G. Roberts and Grant together have been general partners in other investments. Roberts currently maintains his address in Paris, France. Roberts was a client of Freedman's firm in the 1970's and maintained the following address with Grant from 1982 through 1985: Grant/Roberts Investment Banking
Tax Sheltered Investments 745 Fifth *200 Avenue, Suite 410 New York, New York 10022 Elliot I. Miller (Miller) is a practicing attorney who is experienced in tax matters and who was employed as corporate counsel to Packaging Industries Group, Inc. (PI), for 29 years and at all times relevant to this case. Miller is also a shareholder of F & G. He shared office space with Grant and Roberts during 1982 through 1984. Miller represented Grant personally and Grant's clients who invested in other programs which Grant had promoted. Miller met Grant in the 1970's while Grant was involved in exploiting a coal mine. Miller reviewed the offering memorandum for the same venture. Miller is a longtime friend of Winer. John Y. Taggart (Taggart) is a well-known tax attorney practicing in New York City. He was acquainted with Miller for about 15 years prior to 1981. Miller recommended that Roberts employ Taggart as counsel to the general partner in the initial Plastics Recycling partnership. Taggart was head of Windels, Marx, Davies & Ives' (WMDI) tax department and taught tax law as an adjunct professor at the New York University Law School. Taggart previously had been employed by the U.S. Treasury Department in the Office of *201 Tax Legislative Counsel and as a full-time member of the faculty of the New York University Law School and editor in chief of the Tax Law Review. Taggart and other members of his firm prepared the offering memorandum, tax opinion, and other legal documents for the initial Plastics Recycling partnership, for the Clearwater partnership, and for about 16 other Plastics Recycling partnerships. Taggart owned a 6.66-percent interest in a second-tier Plastics Recycling partnership. John D. Bambara (Bambara) is the president of PI, and a member of its board of directors. Bambara, his wife, and daughter own 100 percent of the stock of PI. In addition, Bambara is the president, treasurer, clerk, and director of First Massachusetts Equipment Corp. (FMEC), as well as the owner of 100 percent of its stock. Freedman's firm provided personal tax planning to Bambara. Robert Gottsegen (Gottsegen) is a businessman active in the plastics industry and a long-time business associate of Bambara. Gottsegen and Bambara are co-shareholders in a number of corporations. Miller has represented Gottsegen and Bambara in several business transactions. B. The Entities Involved
PI, a Delaware corporation *202 with its headquarters in Hyannis, Massachusetts, is a closely-held corporation which manufactures thermoplastic and other types of packaging machinery. In addition to a manufacturing plant in Massachusetts, PI has facilities in California and Connecticut. PI holds itself out as the world's largest manufacturer of blister packaging machinery and as fabricating the industry's widest line of thermoforming machinery, including highly specialized disposable medical and food packaging systems. PI is also a producer of foam ranging in density from 1 to 10 pounds per cubic foot and various thermoplastic products, and is the manufacturer of both Sentinel EPE Recyclers, which recycle expanded polyethylene, and Sentinel EPS Recyclers, which recycle expanded polystyrene. In its product division, PI develops machinery used for inhouse production. To protect what PI considers to be its trade secrets, PI purports to maintain security controls. As part of such arrangements, PI sometimes requires the signing of trade secret agreements and sometimes restricts visitors from being admitted to certain facilities. PI does not file for patents on its inventions, allegedly to make PI's designs unavailable *203 to potential competitors. ECI, a New York S corporation, was organized in 1980 and was solely owned by Grant. ECI was formed by Miller for Grant in connection with Grant's involvement with the manufacture of machinery for cogeneration. F & G, a New York corporation which was organized in 1979 as a subchapter S corporation, was owned equally by Freedman and Grant. F & G was organized to participate in leveraged leasing transactions and initially engaged in computer leasing. On August 11, 1982, F & G was merged into a Delaware corporation. Miller reorganized F & G as a subchapter C corporation to act as the safe-harbor lessor and to satisfy the requirements of section 168(f)(8). F & G was chosen to act as the safe-harbor lessor because while participating in leveraged leasing, F & G had accumulated depreciation and net operating losses which could offset taxable income earned in the Plastics Recycling program. Moreover, F & G had a minimal net worth which would allow a low cost of entry for needed new shareholders. Grant sold his entire interest in F & G and Freedman retained only a 9.1-percent interest. Ten new shareholders, including Miller and his secretary Beryl Sherlock, *204 Roberts and his secretary Denise Sausa, Gottsegen, Anthony Giovannone (Giovannone), executive vice president of PI, and Richard Kestenbaum, lead counsel for petitioners in this case, were added for a nominal capital investment of approximately $ 100 each. Clearwater, a New York limited partnership formed on November 17, 1981, is one of many Plastics Recycling partnerships in which Winer is the general partner. Clearwater was set up by Winer when he realized that another Plastics Recycling private offering had attracted more investors than could be accommodated. During 1981, Clearwater entered into leasing arrangements with respect to six Sentinel EPE Recyclers with serial numbers ranging from 395-81-047 to 395-81-052. Clearwater's 1981 Federal income tax return listed licensing as its principal business and recycling equipment as its principal product. FMEC is a Massachusetts corporation which was organized on May 13, 1981, for the purpose of licensing the use of Sentinel recycling equipment. FMEC was owned entirely by Bambara and licensed the recyclers exclusively to PI. II. The Transaction or Deal
A. Planning and Development of the Deal
In the spring of 1981, *205 Grant had a discussion with Miller regarding energy tax credits for recycling equipment. Sometime after this discussion, Gottsegen was considering the installation of energy saving equipment at Bee Plastics, one of his companies, and asked Miller about available tax credits. Gottsegen also inquired about "off-balance-sheet financing", meaning a financing arrangement in which the obligation to repay the money raised either would be entirely unnoted on the balance sheet or would be reflected only as a footnote. Gottsegen asked Miller if PI had equipment that could be used to take advantage of off-balance-sheet financing and tax credits. Miller contacted Bambara to discuss the idea. Bambara told Miller about the recycler prototype, which Bambara thought might be suitable for a venture centering around benefits from tax credits. Miller set up a meeting among Grant, Bambara, Gottsegen, Giovannone, and Miller. At the meeting, Bambara discussed the recycling equipment PI had developed in response to PI's actual or potential problems with scrap disposal. He also referred to PI's ability to manufacture recyclers because of available underutilized plant facilities. Bambara mentioned *206 PI's proprietary interest in the prototype recycler and PI's pricing policies, which PI supposedly regarded as a trade secret. Bambara suggested a price of $ 1 million for each recycler. After the initial meeting, Grant asked Miller to discuss the venture with Freedman, his personal accountant, and with Roberts, who shared office space with Grant. Miller met with Grant, Freedman, and Roberts and recommended that they hire their own counsel. Miller recommended Taggart, a well-known tax lawyer and tax partner at WMDI, and an adjunct professor of tax law at New York University Law School. At one or both of these meetings, the parties discussed setting up a transaction in the form of a leveraged lease. Roberts, Grant, and Miller met Taggart and discussed the structuring of transactions through limited partnerships to achieve the flow-through of tax deductions and credits. Roberts then hired Taggart to represent him in the recycling transactions. Shortly thereafter, Taggart, Grant, Freedman, and Roberts signed secrecy agreements and toured PI's headquarters in Hyannis, Massachusetts. While there, they viewed the prototype recycler and decided to go forward with the venture. After *207 the parties agreed, the prototype was scaled down to a more compact machine that could be used by converters. Under the arrangement as initially conceived, Grant, the investment banker, was given an exclusive 5-year right of first refusal for any recycling equipment developed by PI, but was not obligated to purchase any recyclers. PI would develop and manufacture down-sized recyclers. PI also would control and be responsible for placement of the recyclers with end-users and arrangements for collection or disposition of the product of the recyclers. Initially, the Plastics Recycling transaction was to be a sale-leaseback. The plan involved the syndication of limited partnerships and the sale and leaseback of Sentinel EPE Recyclers financed primarily with nonrecourse notes. A partnership called Hyannis Recycling Associates (Hyannis) was organized with Roberts as its general partner. Taggart drafted the offering memorandum. The transaction was structured as a series of simultaneous transfers as illustrated. ILLUSTRATION 1
HYANNIS TRANSACTION: PATH OF RECYCLERS (PRIOR TO ERTA)
The Hyannis transaction, as initially conceived, involved *208 the proposed sale of recyclers to ECI, which was 100-percent owned by Grant, the holder of an exclusive agreement to purchase the Sentinel Recyclers. ECI then would sell the machines to Hyannis which would lease them to FMEC. FMEC was interposed between the lessor partnership (Hyannis) and the lessee (PI) to license the recyclers to PI on a month-to-month basis. This arrangement supposedly was designed to eliminate any need for reporting a capital lease on PI's balance sheet and to circumvent financing restrictions imposed on PI by an unrelated prior bank loan agreement. To complete the sale-leaseback, FMEC licensed the recyclers to PI. The Hyannis transaction closed on July 31, 1981. After the Hyannis transaction closed, the safe-harbor leasing rules were enacted as part of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172. These rules provided that qualifying transactions would be treated as leases for Federal income tax purposes and included a 90-day window during which transactions completed within the 90 days prior to the date of enactment could be restructured. Roberts asked Miller and Taggart whether it was possible to restructure the transaction *209 to fall within the new rules. To fall within the safe harbor, the Hyannis transaction had to meet certain statutory requirements. One of these requirements was that the safe-harbor lessor be, among other things, a corporation other than a subchapter S corporation or personal holding company, including a closely held corporation in which five shareholders own 50 percent or more of the stock. Sec. 168(f)(8)(B)(i). To meet the safe-harbor requirement, F & G, a corporation closely held by Freedman and Grant, was reorganized as a subchapter C corporation. In addition, 10 new shareholders invested amounts in F & G so that F & G no longer was closely held. At the same time, Grant sold his entire interest in F & G and Freedman sold all but 9.1 percent of his interest in F & G. The Hyannis transaction was restructured in a manner designed to take advantage of the safe-harbor provisions. As part of this restructuring, F & G became the safe-harbor lessor. Subsequent Plastics Recycling programs, including the Clearwater offering, were structured in a manner designed to take advantage of the new statutory safe-harbor opportunities. B. Development of a Machine to Fit Requirements of *210 the Deal
Polyethylene is a large volume commodity usable for many purposes. The total market for polyethylene consists virtually entirely of foam and film applications. About 85 percent of the market involves film applications while foam applications make up only 10 to 15 percent of the market. Polyethylene foam is a highly porous form of polymer which can be produced in various grades or densities. The density of the foam varies inversely with the volume of trapped gases within the polymer. PI produced polyethylene foam of densities ranging from 1 to 10 pounds per cubic foot. In the early 1970's, according to PI executives, three events had occurred to provide an impetus for PI to develop a prototype recycling machine for its own use. First, according to these executives, for a brief time PI experienced a shortage in its supply of virgin resin, the material used to produce a variety of PI's products, and paid relatively high prices for supplies of the material. Second, PI's supply of virgin resin from one supplier, Dow Chemical, was limited, at least potentially, since that company competed with PI with respect to some products. Finally, PI's access to some local landfills *211 in Massachusetts was limited or at least questioned by some town officials. This problem arose because of PI's dumping of large amounts of lightweight scrap which PI generated in manufacturing foam and film products. Under these circumstances, PI began considering alternative ways to dispose of the scrap and provide a constant source of resin. At the same time, PI had excess production capacity in its machinery division which was available for the manufacture of recycling equipment. Bambara asked William Strzelewicz (Strzelewicz), PI's vice president of manufacturing, to try to develop an in-house method of scrap disposal. On a casual and intermittent work schedule over a number of years, Strzelewicz and his associates in PI's foam division, developed the design for a prototype recycler. After a number of unsuccessful attempts, the prototype was completed in 1979 or 1980. PI did not attempt to market the recycler but did use it in its own operations in Hyannis. Sometime after Grant and Roberts toured PI's facilities with Taggart and Freedman, viewed the prototype recycler, and decided to go forward with the venture, Bambara instructed Strzelewicz that the machinery division *212 of PI was going to make a scaled-down version of the recycler and that Giovannone, executive vice president of PI, would be in charge of the process. Under Giovannone's direction, PI's machinery division completed the down-sizing of the prototype. Approximately 80 recyclers which were to be sold in the Plastics Recycling programs were manufactured in 1981. The Sentinel EPE Recyclers were simple batch-type machines designed to grind expanded polyethylene foam and film into a densified form called "popcorn" which could be further processed to produce resin pellets suitable for some uses in the plastics industry. In practice, the recyclers chopped up about 100 pounds of scrap per hour. Operation of the recycler was performed by low-wage factory help with minimal training. The down-sized recycler's component parts consisted of a large drum plastification cylinder, an exhaust blower for removal of volatiles, replaceable rotating and stationary cutting blades, a 40-horsepower motor, a discharge hopper, a control panel, and an opening for manually feeding the scrap. III. What Really Happened Under the Framework of the Transaction or Deal
A. The Investment, the Partnerships, *213 and the Simultaneous Transfers
The participants in the Sentinel Recycler leasing programs invested through tiered partnerships in a series of simultaneous transactions. By a private placement memorandum dated November 17, 1981, Clearwater offered subscriptions for 16 limited partnership units at $ 50,000 per unit. The limited partners owned 99 percent of Clearwater, and the general partner, Winer, owned the remaining 1 percent. Each limited partner was required to have a minimum net worth exclusive of his principal home, furnishings, and automobiles in the amount of $ 200,000 per limited partnership unit. In addition, each partner was required to have enough income during the 1981 taxable year to place the limited partner in an income tax bracket of at least 50 percent. Petitioner received a 16.67-percent interest in the general partnership known as DL and Associates in exchange for his investment of $ 8,333. DL and Associates owned a 6.188-percent limited partnership interest in Clearwater, which leased six Sentinel EPE Recyclers in 1981. The offering memorandum provided the following summary of approximate intended uses of the proceeds from the offering: RECEIPTS:
Amount
Percentage of Proceeds
Limited partners
$ 800,000
General partner
1,000
$ 801,000
100.00
*214 DISBURSEMENTS:
Amount
Percentage of Proceeds
Prepaid rent
$ 605,500
75.59
Commissions/fees
80,000
9.99
General partner's fee
60,000
7.49
Attorney's fee
40,000
5.00
Accountant's fee
2,500
.31
Working capital
13,000
1.62
$ 801,000
100.00
Clearwater's private placement offering memorandum informed investors that the business of the partnership would be conducted in accordance with six simultaneous transactions. The first transaction was the sale by PI of six Sentinel EPE Recyclers to ECI for $ 5,886,000, of which $ 416,600 was paid in cash. The balance was to be paid pursuant to the terms of a 12-year nonrecourse note requiring equal monthly installments of $ 100,917, including annual interest at 19.8 percent with the first payment due 7 months after the closing. ECI's purchase was subject to Clearwater's leasing agreement and FMEC's licensing agreement, as set out below. The interposing of ECI between PI and F & G, a secondary buyer, was consistent with Grant's exclusive arrangement with PI to sell the Sentinel EPE Recyclers and with payment arrangements. The second transaction involved the sale by ECI of the six recyclers to F & G for $ 6,976,000, of *215 which $ 476,233 was paid in cash and the balance paid by a 12-year partial recourse note requiring equal monthly installments of $ 100,917, including annual interest at 15.4 percent. The note was full recourse against F & G to the extent of 10 percent of its face value and the recourse portion was payable only after the 90-percent nonrecourse portion was satisfied. The first payment on the note was due 7 months after the closing. F & G's purchase was subject to Clearwater's agreement to enter into a lease with F & G and was subject to FMEC's agreement to enter into the license as set out below. In the third transaction, F & G leased the six Sentinel EPE Recyclers to Clearwater for 12 years, a lease term equal to 150 percent of the class life of the assets. Under the lease, the monthly rental payment was $ 100,917 with an initial amount of $ 605,500 to be pre-paid at the closing as rental for the first 6 months. The fourth transaction involved Clearwater's licensing of the six Sentinel EPE Recyclers to FMEC for 12 years at a guaranteed minimum royalty of $ 100,917 per month beginning with the seventh month of the license plus a prepaid nonrefundable $ 20,500 advance royalty. *216 After the recyclers were placed in service, the license required additional royalty payments based on a percentage of profits which might be realized on the sale or use of the resin pellets produced from recyclers. The offering memorandum specifically defined "profits" for the purpose of computing the additional royalty as the sales price of the resin pellets (or their fair market value if used by any sublicensee), less the sum of (1) the scrap recycling fee paid to converters, estimated at 15 cents per pound, and (2) an allowance to sublicensees for transporting and further processing the recycled material, estimated at 15 cents per pound. In the fifth transaction, FMEC sublicensed the six recyclers to PI, the manufacturer, on a month-to-month basis for a royalty of $ 100,917 per month. The sublicense to PI was subject to most of the terms of the license from Clearwater to FMEC. The sixth and final transaction involved the month-to-month sublicense by PI of the recyclers to end-users who would do the actual converting of their thermoplastic foam and film. The terms of the sublicense generally required the end-user to pay to PI 100 percent of the recycled foam or film in exchange *217 for a payment from FMEC based on the quality and amount of recycled scrap. There is no evidence that FMEC ever made payments to end-users although on occasion PI made some payments for scrap produced by end-users. Service and installation costs were to be borne by the end-user. End-users were also required to use their best efforts to recycle 220 pounds an hour for 16 hours per week. Supposedly, only PI was to service or repair the recycler. Neither PI, nor the end-users, carried out the terms of the sublicense faithfully. In practice, those terms regularly were ignored. The following diagrams illustrate the six simultaneous transfers of the recyclers among the entities involved and the alleged flow of funds. Fees and costs paid out by the various entities to promoters, accountants, lawyers, et al. are not set out specifically in illustration 3. Petitioners claim that a $ 20,500 advance royalty was paid by FMEC to Clearwater. The record establishes neither the source of such funds nor the actuality of payment. ILLUSTRATION 2
CLEARWATER TRANSACTION: PATH OF RECYCLERS (POST ERTA)
ILLUSTRATION 3
CLEARWATER TRANSACTION: ALLEGED *218 PATH OF THE FLOW OF MONEY
The offering memorandum lists significant business and tax risk factors associated with the investment. Specifically, the offering memorandum states that there was a substantial likelihood of audit by the Internal Revenue Service and that the purchase price paid by F & G to ECI probably would be challenged as being in excess of fair market value; that the partnership had no prior operating history; that the general partner had no prior experience in marketing recycling or similar equipment; that the limited partners had no control over the conduct of the partnership business; that there was no established market for the recyclers; that there could be no assurances that market prices for virgin resin would remain at their current costs per pound, or that the recycled pellets would be as marketable as virgin pellets; and that certain potential conflicts of interest existed. The offering memorandum also includes a discussion of the tax aspects of the transactions and a tax opinion prepared by WMDI concerning the tax issues involved in the Plastics Recycling program. The Clearwater transaction closed on December 21, 1981. *219 B. Operation of the Sentinel EPE Recyclers
The Plastics Recycling programs involved the leasing of Sentinel EPE and EPS recycling machines manufactured by PI. Clearwater leased six Sentinel EPE Recyclers. The entire recycling process consists of four steps: (1) Collecting low-density polyethylene scrap; (2) grinding the scrap into popcorn; (3) extruding the popcorn to get out the remaining volatiles; and (4) feeding the resulting material through a pelletizer to chop it into pellets. The result of the entire process can be a milky-white uniform pellet of resin if appropriate scrap plastic is collected and fed into the machines. The process performed by the Sentinel EPE Recycler consists of grinding the polyethylene scrap into popcorn. The scrap is fed manually into the large drum cylinder which contains stationary blades and rotary blades. The rotary blades move at high speeds producing friction which heats the scrap. Once the scrap begins to densify, water may be added to cool and stiffen the material. At times, either no water was used in the process or water was just dumped into the recycler by the pail. The recycled material then is discharged from the machine. *220 The resulting popcorn looks like white crumb of varied size. At no time were all six of the Sentinel EPE Recyclers, serial numbers 395-81-047 to 395-81-052, leased by Clearwater, placed with end-users. PI's records regarding the six Clearwater recyclers are incomplete and unreliable. From the testimony of end-users, and the evidence provided by PI and its employees, we find that the recyclers were used infrequently and they often were not in use at all. PI failed promptly to pick up either the scrap or machines rejected by prospective end-users, and at times did not pay the end-user for the scrap that PI did pick up. For example, one of the six recyclers bought by Clearwater was placed with four different end-users in 4 years. The first end-user was Olympic Spa Covers, Inc., which refused to accept delivery of the recycler. The second end-user was Great Western Foam, which found the recycler to be too costly and noisy. PI took 6 months to pick up the recycler after PI was notified that Great Western Foam no longer wanted the recycler. The third end-user, Midco Packaging, ran a cost/benefit analysis on the recycler and found it unprofitable. PI waited another 6 months before *221 picking up the recycler. Spokane Packaging, the last end-user to have the machine, used it infrequently and was not paid for the recycled scrap produced. IV. Machines for Recycling Plastic Which Were Available on the Open Market in 1981
The following recycling machines were commercially available during the year at issue: A. Buss-Condux Plastcompactor
The Buss-Condux Plastcompactor (Plastcompactor) was advertised in trade journals during 1981 and was described as a machine capable of transforming foam into free-flowing, densified granulate suitable for processing. The Plastcompactor process was advertised as continuous plastification and densification between two disks -- one rotating, the other stationary, in a water-free operation and without product degradation. The Plastcompactor is manufactured in two sizes, the CV30, which processes about 300 pounds per hour of polyethylene foam and the CV50, which processes about 700 pounds per hour of foam. These machines were available in 1981 at respective prices of approximately $ 90,000 and $ 180,000. B. Nelmor/Weiss Densification System (Regenolux)
The Nelmor/Weiss Regenolux is a batch-type machine which densifies *222 materials including low-density polyethylene foam scrap. The Regenolux uses rotating blades which cut the scrap material and creates frictional heat. As the temperature of the scrap increases, the material softens. Water mist cools and solidifies the material to form uniform densified particles. The Regenolux RL-450 was advertised for sale and was commercially available at a selling price of $ 38,000 in 1981. The Regenolux can process scrap at rapid rates. C. Cumberland Granulators
Cumberland Engineering, a division of John Brown and Co., and associated companies manufactured a complete line of recycling equipment including grinders, extruders, and pelletizers. The entire system of components was available for less than $ 200,000. D. Foremost Densilator
The Densilator is a machine available since 1978 from Foremost Machine Builders, Inc. Although the Densilator was marketed for the reclaiming of polyethylene film, the Densilator process is similar to that of the Sentinel EPE Recycler. The Densilator shreds the scrap with a rotary blade and converts the material to a mass by the heat produced by the shredding. The Foremost machine sold in 1981 for approximately *223 $ 20,000. V. Expert Opinions
Both parties offered expert testimony concerning the value of the recycling equipment and the value associated with the alleged obligation of PI to install, maintain, and insure the equipment. These experts largely disagree. A. Petitioners' Experts
1. Donald N. Merino
Donald N. Merino (Merino) is a professor of management at Stevens Institute of Technology. He holds a Ph.D. in managerial economics and his undergraduate training is in engineering. Merino submitted a report and testified as to the economics of the transaction and the value of the Sentinel EPE Recycler. Merino also is an investor in another Plastics Recycling program. Merino invested $ 24,000 in Northeast Resource Recovery Associates. As a result of this investment, Merino claimed on his 1981 income tax return $ 36,000 of tax credits and $ 19,526.16 of partnership losses. Merino's entire report is based on the assumption that the Sentinel EPE Recycler is a unique product for which there is no competition so that PI holds a monopoly on a product needed by others. Merino's report is divided into three parts. The first part of Merino's report includes a discussion *224 of economic principles and the method he used to value the Sentinel EPE Recycler, i.e., an after tax cash-flow basis discounted for the time value of money to determine the internal rate of return (IRR). The IRR is defined as a rate of return calculated to take into account only the cash receipts and disbursements generated by an investment, their timing, and the time value of money. Generally, if the IRR is equal to a project's rate for cost of capital, the project will break even. If the IRR is greater than the rate for cost of capital, then the project is presumed to be financially profitable. Conversely, if the IRR is less than the rate for cost of capital, the project is presumed to be unprofitable. Merino also calculated the Minimum Attractive Rate of Return (MARR). MARR is the effective annual rate of return on investment, either before or after taxes, which just meets the investor's threshold of acceptability. Merino stated that the appropriate MARR used for investment in new equipment varies between 10 percent and 15 percent per annum after tax. Merino explained that if the IRR is greater than the MARR, then the project is acceptable. The second part of Merino's *225 report evaluated the recycler at the time of the Clearwater offering from the viewpoint of investors and end-users. Merino concluded that the sale of a recycler at $ 1,162,666 would yield an IRR of approximately 12 percent per annum which, when compared to a MARR of 10 percent, would make the investment economically acceptable from an investor's point of view. Merino performed a similar calculation for end-users and concluded that they would also find the project to be economically acceptable. The last part of Merino's report evaluated the recycler's price based on a visit to Rempac, where a Sentinel EPE Recycler had been placed for use. Merino alleged that a Rempac representative advised him that popcorn scrap then was being sold by Rempac to an extrusion processor for 20 cents per pound and that the machine was in use at Rempac several days each week and processed 200 to 300 pounds per hour. On these assumptions, among others, Merino again calculated that the project would yield an IRR that was greater than the user's MARR, making the project economically acceptable. The testimony of Rempac officers establishes that Merino's assumptions about Rempac usage are faulty in several *226 respects. Rempac did not sell popcorn for 20 cents per pound and sold only to PI. At Rempac, the machine was operated only 1 day per week and produced only 100 pounds per hour. Merino's assumptions concerning the value of popcorn scrap and virgin resin are high and he overstates the value of the recycled product compared to virgin resin. Moreover, in his calculations, Merino understates other cost factors such as electricity and fails to consider adequately the cost of additional processes of extruding and pelletizing which are necessary to bring the recycled material to a stage where it can be sold in the market for resin pellets. 2. James D. Fogarty
Petitioners' second valuation witness, James D. Fogarty (Fogarty), is president of Plastic Engineering Associates, Inc., and has extensive experience in the plastics industry. Fogarty submitted a report and testified as to value based on trade literature available in 1981 and his visit in October of 1986 to Hyannis where he viewed a Sentinel EPE Recycler in operation. In his report, Fogarty concluded that a fair market value of $ 1,162,667 was justified solely on the basis of the Sentinel EPE Recycler being the only machine *227 during 1981 capable of recycling low-density expanded polyethylene foam, again an assumption of a monopoly position. He stated that the blades on the outer cylinder of the recycler and the way the recycler removed the volatiles from the scrap made the Sentinel EPE Recycler unique. 3. Robert F. Staats-Westover and Leonard Sansone
Robert F. Staats-Westover (Staats-Westover) is the manager of the New Jersey Polymer Extension Center at Stevens Institute of Technology and an adjunct professor of chemical engineering who submitted an expert report. Leonard Sansone (Sansone) is the president of Sussex Plastics Engineering Inc., and an engineer/consultant who coauthored the report submitted by Staats-Westover. They testified as to the value of the recycler, the economics of the transaction, and the price of resin during the year in issue. The Sansone/Staats-Westover report includes a conclusion that the Sentinel EPE Recycler was a unique and successful commercial recycling machine capable of densifying low-density polyethylene foam to rigid granular feed stock at a rate of 200 to 300 pounds per hour. It is the opinion of the authors of this report that $ 1,162,666 was a reasonable *228 price given a rate of return exceeding 10 percent. That conclusion was based on a review of the economic calculations provided by Merino and a visit to Rempac where a Sentinel EPE Recycler was in operation and where recycled pellets were allegedly being sold for 20 cents per pound to an extrusion processor. As we have noted, that assumption plainly was incorrect. They also reviewed Merino's report and found it to be accurate, provided the recycler actually was unique. Their conclusion that the recycler was unique was based on Merino's findings and was not independently confirmed. 4. Albert Spaak
Albert Spaak (Spaak) testified as to the value of the recyclers and the economics of the Plastics Recycling transaction. Spaak submitted a written report which purported to verify that the Sentinel EPE Recycler was the only commercial equipment capable of recycling low-density polyethylene foam during 1981. Spaak considered the product and the Sentinel EPE Recycler's method of cutting to be unique and thought of PI's arrangement as a monopoly. He reviewed Merino's report and found Merino's numbers "to be conservative and reasonable." Spaak also reviewed Fogarty's report and agreed *229 with its conclusions. He did not personally view or inspect a Sentinel EPE Recycler in operation. His opinion was based primarily on photographs of the machine and conversations with other experts. On cross-examination, Spaak said that other companies had found various ways to reclaim scrap. His report included a comment that PI's competitors had "found ingenious ways to handle their scrap." 5. Samuel Z. Burstein and Stanley Ulanoff
Samuel Z. Burstein (Burstein) and Stanley Ulanoff (Ulanoff), the "F & G evaluators", provided reports which were part of the Clearwater offering memorandum. They did not appear to testify in support of their reports in this case and so avoided cross-examination as to the basis for their conclusions. Ulanoff is a professor of marketing at Baruch College who has authored numerous books on technical and marketing subjects. His report covered the marketing value and potential of the recyclers and expressed the conclusion that the sales price paid by F & G for the recyclers and the rental payment made by Clearwater were fair and reasonable. His conclusion allegedly was based on his personal observation of the Sentinel EPE Recycler prototype during *230 a visit to PI, discussions with PI employees, the needs of the plastics industry, and his analysis of the economic projections provided in the offering memorandum. Burstein is an associate professor of mathematics at New York University. Allegedly based on his visit to PI, discussions with PI personnel, an evaluation of the technical value of the recycler, the recycler's history of performance, and information concerning the use of recycled polyethylene as a raw material, Burstein concluded that the Sentinel EPE Recycler was capable of recycling on a continuous basis. B. Respondent's Experts
1. Garth Saloner and Janusz Ordover
Garth Saloner (Saloner) and Janusz Ordover (Ordover) coauthored a report, the purpose of which was to estimate the value of the Sentinel EPE Recycler to a potential purchaser. Saloner is an associate professor of economics and management at Massachusetts Institute of Technology. He gave expert testimony regarding the economic potential of the Plastics Recycling programs. Ordover is a professor of economics at New York University. In their report, Saloner and Ordover concluded that using very favorable economic assumptions and the net present *231 value (NPV) method, the value of the recycler at the time of the Clearwater offering was between $ 37,000 and $ 68,000, depending on the useful life of the recycler. The NPV method is based on a projection of revenue and cost flows as well as savings achieved (by eliminating the cost of waste disposal). Adjustments were made for inflation and the time value of money. 2. Steven Grossman
Steven Grossman (Grossman) is an assistant professor in the Plastics Engineering Department at the University of Lowell. He gave expert testimony regarding the limited market for the recycled plastic material and submitted a report. Grossman concluded that the Sentinel EPE Recycler was unlikely to be a successful product because of the absence of any new technology, the absence of a continuous source of suitable scrap, and the absence of any established market. Grossman suggested that a reasonable comparison of the products available in the polyethylene industry in 1981 with the Sentinel EPE Recycler would reveal that the Sentinel EPE Recycler had very little commercial value and was little different from other products available on the market in component form. Grossman's opinion regarding *232 the Sentinel EPE Recycler was based on the descriptions of the Sentinel EPE Recycler given in other experts' reports and the offering memorandum. He neither tested nor examined the Sentinel EPE Recycler or any of the other commercially available machines. 3. Richard S. Lindstrom
Richard S. Lindstrom (Lindstrom) of Arthur D. Little, Inc., a consultant with more than 30 years of experience with plastics and plastics equipment, submitted a report in conjunction with his expert testimony regarding the value of the recyclers. In his report, he determined that several different types of equipment capable of recycling expanded polyethylene were available and priced at approximately $ 50,000 in 1981. Although Lindstrom initially was prevented from closely examining the recycler, based on his later observations of the Sentinel EPE Recycler in operation, Lindstrom estimated the manufacturing cost of the Sentinel EPE Recycler to be approximately $ 20,000. Before trial, but subsequent to completion of his report, Lindstrom was allowed to inspect another Sentinel EPE Recycler closely at another location, to take photographs of the recycler, and to look at blueprints for the recycler. *233 ULTIMATE FINDINGS OF FACT 1. The fair market value of a Sentinel EPE Recycler during 1981 was not in excess of $ 50,000. 2. The Clearwater limited partnership transaction lacked economic substance since the Clearwater partnership had no net equity value and since the only activity with which Clearwater was involved lacked any potential for profit. 3. Petitioners' objective in investing in the Sentinel EPE Recycler leasing program was to gain a significant tax advantage and not to earn an economic profit. OPINION I. Preliminary Matters
Petitioner's position in this case is that the series of transactions involved in the Plastics Recycling programs should be considered effective for tax purposes regardless of whether the entire deal was a sham. Petitioners contend that the purpose of the safe-harbor provisions is to allow the transfer of tax benefits, and if a lease meets all of the statutory requirements of section 168(f)(8), the transaction is to be treated as a lease without considering any other factors. Alternatively, petitioners argue that even if a sham testing is applicable, the transactions should be treated as valid business activities for tax purposes because *234 they presented a significant and realistic possibility of profit, had economic substance, and were motivated by valid business purposes. Respondent argues that the safe-harbor leasing rules of section 168(f)(8) do not prevent the application of the sham in substance test to a series of transactions of which a safe-harbor lease is just a part. Respondent's position is that the lease is a part of a tax-avoidance scheme and that the entire transaction should be disregarded for Federal income tax purposes. In Greene v. Commissioner, 88 T.C. 376, 382-383 (1987), this Court decided that there is nothing in the legislative history of the safe-harbor leasing rules which indicates that such a lease can be isolated as a matter of law from the transactions which surround it for the purpose of making the sham transaction doctrine inapplicable to the entire transaction. Petitioners have urged a review of the rule set forth in the Greene opinion, but we adhere to and follow that opinion. In Greene v. Commissioner, supra at 383, this Court invited the taxpayers "to persuade us that the lease in fact should be so isolated and that their claim to *235 the benefits of section 168(f)(8) is otherwise valid." We have not been so persuaded by petitioners here, but instead, we find that in fact the purported safe-harbor lease was merely one segment of a chain of carefully planned, interdependent transactions in a single program. The traditional sham transaction doctrine is applicable to the integrated series of transactions involved in the Plastics Recycling program. In the notice of deficiency in this case, respondent disallowed all the claimed deductions and credits relating to petitioners' Plastics Recycling investment. Respondent's determination is presumptively correct and petitioners bear the burden of proof on all pertinent items. Rule 142(a); see Welch v. Helvering, 290 U.S. 111 (1933). II. The Transaction or Deal in Issue Here Is a Sham
The principal question for consideration here is whether the transaction, into which the supposed safe-harbor lease was integrated, was a sham. In general, a transaction will not be considered a sham where there is a genuine multiple party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent *236 considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached. Frank Lyon Co. v. United States, 435 U.S. 561, 584-585 (1978). Taxpayers are free to structure their business transactions as they wish, even if they are motivated by tax-avoidance considerations, provided a nontax or business purpose also is present. Knetsch v. United States, 364 U.S. 361, 365-366 (1960); Gregory v. Helvering, 293 U.S. 465, 469 (1935). In applying these basic rules in more recent cases involving the question whether a purported business transaction is a sham, we have first inquired whether the transactions were factual shams designed and carried out for tax avoidance. See, e.g., Freytag v. Commissioner, 89 T.C. 849, 876-877 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S.    , 59 U.S.L.W. 4872 (June 27, 1991). If such transactions existed in fact, the question is whether such transactions, nevertheless, amount to a sham in substance. In the present case, respondent has introduced expert testimony to the effect *237 that the market value of the Sentinel EPE Recycler during year in issue may have been negligible and evidence that end-users found the machine of little or no value. Respondent also has introduced and relied upon credible expert testimony that the recycling machine in issue is similar to others actually on the market and might properly be valued as high as $ 50,000. Accordingly, in our view for purposes of this case only, respondent effectively has conceded that the Clearwater transaction is not a factual sham. Respondent plainly has not conceded that the Clearwater transactions have sufficient economic substance to support the tax results claimed by petitioners. Respondent's contention is that the transaction in issue is a sham in substance. This Court has defined "sham in substance" as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). In essence, a sham in substance exists when a series of transactions actually takes place, but has no business or profit-making function other than *238 the obtaining of tax benefits. As applied in Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983), the sham in substance test is a two-prong test which is met if either the economic substance test or the business purpose test can be satisfied. The business purpose test focuses on the investor's subjective purpose for entering the transaction while the economic substance test focuses on the objective factors indicating whether there was a reasonable opportunity to make a profit, exclusive of tax benefits. Rice's Toyota World, Inc. v. Commissioner, supra.
Although we are not required to adopt a rigid two-prong subjective/objective test, in our view economic substance and business purpose are relevant inquiries to consider in applying the traditional sham analysis. Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), affg. T.C. Memo. 1987-626; Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985); Cherin v. Commissioner, 89 T.C. 986 (1987). *239 In Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), this Court stated a modified approach to evaluating tax shelter cases. In doing so, the Court identified the uniform characteristics of a "generic tax shelter". Regardless of how the test is labeled, the underlying determination to be made is whether the transaction had an economic effect other than the creation of tax losses. Rose v. Commissioner, 868 F.2d at 854. In this case, appeal from our decision would lie with the Court of Appeals for the Sixth Circuit, the Court which reviewed the Rose case. This Court will follow a Court of Appeals decision which is squarely on point where appeal from our decision lies in that Court. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971). Although the Sixth Circuit affirmed our holding in the Rose case, it declined to adopt the generic tax shelter analysis. Rose v. Commissioner, supra at 853-854. Accordingly, we have not pursued that analysis but instead consider whether there was any *240 economic substance or business purpose in these transactions. We do not consider whether, in light of hindsight, the taxpayer made a wise investment, but rather whether he made any bona fide investment at all or merely purchased tax deductions. Bryant v. Commissioner, 928 F.2d 745, 749 (6th Cir. 1991). A. The Deal Lacks Economic Substance
Petitioner argues that the form of the Plastics Recycling program should be upheld under the economic substance test since Clearwater conducted an activity that had the potential for substantial profit. Petitioner relies in part on expert testimony to establish the value of the Sentinel EPE Recyclers, the economics of the transaction, and the price of virgin resin in 1981. Respondent argues that the recyclers were grossly overvalued and that the transaction lacked economic substance. Respondent contends that based on the testimony and economic calculations of experts, the Sentinel EPE Recycler had a maximum value of $ 30,000. The economic substance test is based on objective factors which indicate whether the taxpayer acquired an equity interest in the property and whether he had a reasonable opportunity for economic *241 success. In Levy v. Commissioner, 91 T.C. 838, 856 (1988), we found the following factors to be particularly important: The presence or absence of arm's-length price negotiations, Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. 860 F.2d 1075 (3d Cir. 1988); the relationship between the sales price and fair market value, Zirker v. Commissioner, 87 T.C. 970, 976 (1986); the structure of the financing, Helba v. Commissioner, supra at 1007-1011; the degree of adherence to contractual terms, id. at 1011; and the reasonableness of the income projections, Rice's Toyota World, Inc. v. Commissioner, supra at 204-207. 1. Equity Interest
One aspect of the economic substance test focuses on whether the buyer/lessor has obtained an equity interest in the equipment purchased. A meaningful equity interest in the property may be established by a payment in cash or by personal liability on a recourse debt. Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976). In Estate of Franklin v. Commissioner, supra at 1048-1049, *242 the Court of Appeals for the Ninth Circuit found that if a purchase price substantially exceeds the fair market value of property and the purchase is financed almost entirely with nonrecourse indebtedness, then payments on the debt do not result in equity because by abandoning the transaction the buyer would lose no more than the chance to acquire future equity if the property value actually increases. To apply this test, we first must determine the fair market value of the Sentinel EPE Recycler. The standard for measuring fair market value is the price at which the property would change hands between a hypothetical willing buyer and seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973). Fair market value is inherently a question of fact to be resolved by weighing all the relevant evidence in the record and drawing appropriate inferences therefrom. Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987). The record is devoid of any factual data regarding the actual costs of producing a Sentinel EPE Recycler. PI kept no *243 records of the research and development costs incurred by the foam division in developing the prototype. The record in this case does not include any evidence of records of the costs of manufacturing the scaled-down recyclers kept by the machinery division. The $ 1 million price Bambara supposedly set for the Sentinel EPE Recycler, allegedly based on a pricing policy which PI regarded as a "trade secret", had nothing to do with costs because PI had no cost accounting system or records. This supposed price tag had nothing to do with traditional supply and demand pricing since the product never was offered on the open market and there is no evidence that anyone ever intended that it would be so offered. We are not convinced that Bambara actually expected to receive more than the initial cash payment. The rest of the supposed purchase price was mere window dressing used to disguise a series of offsetting payments only realized in the form of bookkeeping entries. To establish the fair market value of the recycler, petitioner and respondent presented the testimony of numerous experts. Opinions of experts are not binding on this Court and may be rejected entirely if contrary to our *244 judgment. Helvering v. National Grocery Co., 304 U.S. 282 (1938); Laureys v. Commissioner, 92 T.C. 101, 122-129 (1989); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Merino, petitioners' key valuation witness, found that the Sentinel EPE Recycler was worth at least the purchase price based on a calculation using the IRR method. Merino's valuation was based on the assumption that PI had a monopoly position with respect to a product for which there was a substantial market. We have found from the substantial evidence presented by respondent that PI did not have a monopoly but was entering a market in which there were competitive machines. We also have found that in that market place the PI product's value was not in excess of $ 50,000. Since Merino's testimony is based on a false premise and since Merino himself invested a substantial amount in a Plastics Recycling program and testified more in the manner of an advocate or an interested party than a disinterested expert in giving his opinion, we find his testimony to be self-serving, unpersuasive, and of little or no value. Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), *245 affg. 41 T.C. 593 (1964). Fogarty, another of petitioners' valuation witnesses, also claimed that the nominal selling price was reasonable. Fogarty's opinion was based on his belief that no other product on the market in 1981 was capable of recycling low-density polyethylene. Since we have found as a fact that there were commercially available machines which were capable of performing the same process as the Sentinel EPE Recycler, we consider Fogarty's opinion also of little or no value. We note that Fogarty asserted that the Sentinel EPE Recycler was unique because of the blades on the outer portion of the cylinder of the recycler and the way the recycler removed the volatiles from the scrap. Spaak explained: "The uniqueness is the method of cutting the foam material." Another vague suggestion of uniqueness concerned the cooling process. The offering memorandum explanation of the operation of the EPE recyclers states: "After further purification, the densified Mass is then cooled through the latent heat of vaporization of injected fluid mixed with chemical compounds regarded by PI as trade secrets." (Emphasis added.) Petitioners' tax counsel, admittedly *246 no engineer, testified that the EPE Recycler was unique because: they had some fluid that they regarded as a trade secret that got injected that had the effect of enabling them to take out the gas and vent that off and, at the same time, taking the plastic and turn it back into something that is called 'popcorn', which was pure plastic, which could then be converted into pellets in a fairly simple process and, in effect, could be utilized again, just as it had been virgin material.
Strzelewicz, who supervised development of PI's prototype recycler, explained that the coolant used in the process was plain water and not some "trade secret" chemical compound. End-users stated that a usual method by which the water might be "injected" was for a factory worker to dump it on the heated material. Repeatedly, petitioners' witnesses failed to identify adequately any unique aspect of the EPE Recycler to explain the immensely inflated value claimed for the unit. The testimony and report by Sansone and Staats-Westover is similarly flawed, in that they also based their opinion on the calculations performed by Merino without independently verifying the results. Moreover, their results *247 presumed the Sentinel EPE Recycler actually was unique. We are unconvinced by the opinion of Spaak, who also found the selling price to be reasonable. He based his opinion on the descriptions and calculations of other experts without independently verifying the basis for his conclusion. Essentially, he merely made a survey of various out-of-Court materials and relied heavily on the Merino report. Moreover, although Spaak testified that the Sentinel EPE Recycler was unique, he also admitted at trial that PI's competitors had found "ingenious" ways of recycling foam. Petitioner's reliance on his experts as well as the F & G evaluators is misplaced. Petitioner supposedly relied on the marketing opinion of Ulanoff and the technical opinion of Burstein included in the offering memorandum. Except for the date, duplicates of these documents were included in every private offering memoranda relating to the Plastics Recycling programs. Ulanoff was hired by F & G at the suggestion of Grant, the sole owner of ECI. Ulanoff and Burstein each owned an interest in more than one partnership which owned Sentinel Recyclers as part of the Plastics Recycling program. The reports prepared by *248 Ulanoff and Burstein concluded that the transaction was feasible from a technical and marketing standpoint and that the price paid to ECI was fair and reasonable. Ulanoff and Burstein did not testify at the trial of this case and we consider their reports of no significant value. Respondent's valuation witness, Saloner, used the NPV method to calculate the value of the recycler at $ 37,000 to $ 42,000. Respondent's technical expert, Grossman, found the recycler to be almost valueless. He based his conclusion on a comparison of the recycler with the other products available for thermoplastic scrap recycling that were similar in design and construction to the Sentinel EPE Recycler. Lindstrom, a valuation witness for respondent, also based his evaluation on a comparison between the Sentinel EPE Recycler and the other commercially available machines. Lindstrom estimated the market value of the Sentinel EPE Recycler at approximately $ 50,000 and estimated the manufacturing cost to be in the range of $ 20,000. Lindstrom's statements of his opinion and the basis for it were reasonable and persuasive, and we have relied heavily on his expert report and testimony in making our finding *249 of fact as to valuation. As for Sansone, Staats-Westover, and Spaak, they based their opinions on data given to them by Merino. Lindstrom came to his conclusion based on a survey of competing machines and his personal observation of the machines. Respondent's expert Saloner used the NPV method and valued the recycler at a maximum of $ 42,000. Petitioner's expert Merino used the IRR method and valued the recycler at the selling price. The variations in valuations are based on dramatic differences in the assumptions made by each of the experts, including differences regarding the resale price of the recycled material, the quantity of recycled material the recycler is capable of producing, and the quantity of available scrap to be recycled. Obviously, whether the leased Sentinel EPE Recyclers generate a positive or negative discounted cash-flow to the investor depends on whose assumptions are more accurate. Merino's assumptions as to the pricing and value of virgin pellets and as to the value of the popcorn produced by the Sentinel EPE Recycler and the price of pellets were flawed. His assumptions as to the productivity of the Sentinel EPE Recycler were contrary to the testimony *250 of an officer of Rempac, the very end-user from whom he supposedly obtained information. Most important, Merino assumed a monopoly which we have found nonexistent. Moreover, we have already determined that Merino's opinion is of questionable reliability or value because of his personal financial interest in the outcome of this case. We have found Lindstrom's conclusions persuasive and determined the value of the Sentinel EPE Recycler to be not in excess of $ 50,000. The purchase price of $ 1,162,666 is inflated by more than 23 times its actual value. This determination is buttressed by the fact that the recyclers were only insured by PI for $ 55,000 per machine with a $ 25,000 deductible per machine and by respondent's experts' testimony and a comparison with other machines which were commercially available in 1981. In the present case, F & G had no reason to anticipate a profit in the foreseeable future. The structure of the financing was such that approximately 83 percent of the purchase price was financed using nonrecourse notes. Moreover, the recourse portion of the notes was not payable until the nonrecourse portion was satisfied. F & G's equity is limited to the fair *251 market value of the recycler. Any additional amounts paid for the recyclers in excess of the fair market value are not considered equity. Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976). Petitioner alleges that Bambara unilaterally decided what price would be paid for the recyclers and based that price on PI's pricing policies which were a "trade secret". Petitioner also asserts that at the insistence of PI's auditors, Bambara decided to use nonrecourse financing in the transaction. There is no reliable evidence to support this claim. Instead, the record shows that a grossly inflated purchase price which has no relationship to fair market value was conjured up to maximize the available deductions and credits. See Zirker v. Commissioner, 87 T.C. 970 (1986). Winer, as general partner of Clearwater, did not enter into arm's-length negotiation of the terms of the lease with F & G. Neither did F & G enter into an arm's-length negotiation with ECI, despite the self-serving testimony of Grant, who would have us believe that he negotiated the sales price with Freedman, his personal accountant, business associate, and consultant. *252 The manner in which the transaction was structured, the lack of arm's-length dealings, and the discrepancy between the fair market value and purchase price on which the pass-throughs were based show the true nature of these transactions. Beck v. Commissioner, 85 T.C. 557, 577-578 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983). 2. Opportunity for Economic Success
The opportunity for economic success is illustrative of economic substance and generally refers to the chances of making a profit in addition to tax savings. Frank Lyon v. United States, 435 U.S. 561 (1978). The contractual terms and the reasonableness of the income projections are of importance in evaluating the opportunity for success. The record here includes contract terms which were designed to allow petitioners to obtain tax benefits with minimal exposure to business risk. In the Clearwater offering, the sale to ECI, the resale to F & G, the leasing to Clearwater, the licensing to FMEC, and the sublicensing to PI, the original purported transfers occurred on the same day. Each entity allegedly made and received monthly payments in the amount *253 of $ 100,917. The price of the six Sentinel EPE Recyclers here in question to F & G was $ 6,976,000, including $ 476,233 in cash and a partial nonrecourse note equivalent to the balance. The note required payment of equal monthly installments of $ 100,917 to maturity. The transaction provided for Clearwater contemporaneously to license the recyclers to FMEC for 12 years at $ 100,917 per month, plus a lump-sum payment equivalent to 7 months' rent. In accordance with the plan, FMEC was to receive a monthly royalty payment in the same amount from PI which also was to receive the same amount from ECI. All of the entities involved in the transactions purportedly entered into "offset agreements" so that the monthly payments of $ 100,917 were bookkeeping entries only. In effect, no income was received or expected beyond the initial payments. There is no credible evidence showing that monthly rental payments ever were made to F & G and Clearwater had virtually no obligation to pay anything further. The actions of petitioners and their associates with regard to their investments corroborate the lack of profit objective. Projections set forth in the prospectus were not reasonably relied *254 on. Despite clear indications that PI was not aggressively seeking to place or properly managing the recyclers, petitioners did little to safeguard their investment. They only made a few indirect half-hearted inquiries. Petitioner was not even aware of where the recyclers were installed. Rather, petitioner had substantial income and was aware that the Plastics Recycling programs were tax shelters designed to attract investors looking for tax savings. The offering memorandum and other documents evidencing the labyrinthine transactions here in issue demonstrate the very high level of expertise, ingenuity, and sophistication of the individuals who devised the Plastics Recycling transactions. Nevertheless, after considering the lack of any real equity interest in the recyclers for petitioner and other limited partners, and the lack of a genuine opportunity for the partnership to have any economic success, we conclude that the 1981 Plastics Recycling programs lacked economic substance. B. The Deal Lacks Business Purpose
The second prong of the sham in substance test requires a business purpose other than tax benefits. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), *255 affg. in part and revg. in part 81 T.C. 184 (1983); Rose v. Commissioner, 88 T.C. 386, 412-413 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Petitioners were nonuser recipients of tax benefits as a result of the sale and leaseback of the recycling equipment. A nonuser recipient of tax benefits in a sale and leaseback context must specifically establish that he entered into the transaction motivated by a business purpose sufficient to justify the form of the transaction. Levy v. Commissioner, 91 T.C. 838, 854 (1988); Larsen v. Commissioner, 89 T.C. 1229, 1252 (1987), affd. in part and revd. in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). A determination of profit objective can be made with reference to the actions of those individuals who manage the affairs of the partnership. Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion *256 sub nom. Zemel v. Commissioner, 734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, 734 F.2d 5 (3d Cir. 1984). The burden of proving such objective is on petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Greater weight is given to objective facts than to a taxpayer's statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.
The six machines leased by Clearwater's partnership had a total reported cost of over $ 6,600,000. None of these six machines were shipped to an end-user by the end of 1981. Two of the six machines never worked and remained for most of 1981 through 1985 in a PI warehouse. One machine was sent unsolicited to a company which refused to take the machine and immediately returned the invoice to PI. Clearwater *257 did not purchase insurance to protect the partners from their liability for any loss to recyclers purportedly worth approximately $ 6 million. PI insured the recyclers against all risks of loss, damage, or destruction, and that coverage was only for $ 55,000 per machine, with a $ 25,000 deductible per machine. The focus of promotional material distributed to prospective investors is a significant indication of the objective of those who choose to invest. Friedman v. Commissioner, 869 F.2d 785, 793 (4th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). Offering materials which focus on tax benefits and do not provide a sound basis for a profitable operation are indicative of a lack of profit objective. Beck v. Commissioner, 85 T.C. 557, 571 (1985); Seaman v. Commissioner, 84 T.C. 564, 590 (1985). According to the Clearwater offering memorandum, the projected benefits for each $ 50,000 investor were investment tax credits in 1981 of $ 86,328 plus deductions in 1981 of $ 39,399. In addition to the foregoing factors, in other leasing cases we have examined, the discounted cash-flow to the *258 investor is evidence of economic profit objective. Soriano v. Commissioner, 90 T.C. 44 (1988). The first question is whether petitioner's leasing activity could possibly have produced a positive discounted cash-flow. Petitioner argues that the Plastics Recycling programs were economically viable. Respondent argues that the Plastics Recycling programs never could produce a positive discounted cash-flow because the promoters placed the equipment with end-users who generated too little scrap ever to pay off the notes on the machines. Respondent's economic experts testified that using the same discounted cash-flow analysis found in the Soriano case, the Sentinel EPE Recyclers had a value in 1981 of a maximum of $ 50,000 and a minimum of zero. Since petitioner's economic expert Merino, as well as the F & G evaluators Burstein and Ulanoff, were investors in the Plastics Recycling programs, we consider their conclusions regarding the recyclers to be unreliable. Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964). In addition, we give less weight to the complex calculations of petitioner's experts *259 when a comparable product is widely available and its price is known. Respondent's economic experts, Saloner of the Massachusetts Institute of Technology and Grossman of the University of Lowell, gave their expert opinions regarding the economic potential of the Plastics Recycling programs. Grossman testified to the limited market for the recycled plastic material as well as the degradation and inferior quality of the product. Saloner testified that the discounted cash-flow would be negative if it were computed by Merino's methodology with either the fact assumptions set forth in the offering memorandum or the assumptions in Saloner's own report. In this type of leasing transaction, if the discounted cash-flow is negative, the investor never could earn a profit. Soriano v. Commissioner, supra at 55-56. If there is no opportunity to make a profit by leasing Sentinel EPE Recyclers, petitioner is unlikely to have been motivated to invest by an objective of earning an economic profit. Id. at 56. We have found as a fact that the fair market value of the Sentinel EPE Recycler was not in excess of $ 50,000 in 1981. We base this conclusion *260 primarily on the fact that comparable products were available for that price and less. We note that the traditional measure of fair market value does not by itself establish the economic viability of a venture involving leased assets. However, a projected cash-flow analysis provides a means of determining whether the transaction realistically had any possibility for economic profit. See Soriano v. Commissioner, supra.Such projections are, in effect, a determination of the fair market value of the leased interest. Here the fair market value of each recycler was $ 50,000 ($ 300,000 for the six required by Clearwater), the monthly rental payment for Clearwater was $ 100,917, and the advance rental payment by Clearwater was $ 605,500. The advance lease payment was twice the fair market value of the assets and each month's lease payment was one-third of the total amount of the assets' fair market value. This evidence strongly suggests indifference towards economic profit. Soriano v. Commissioner, supra at 56-57. The financial projections included in the offering memorandum were not met. Although the operational failure of a transaction *261 does not destroy an otherwise valid profit objective, it is a relevant factor to consider in determining whether an adequate investigation was made prior to investment and whether the objective to earn an economic profit existed at the time the transaction was entered into. Thomas v. Commissioner, 84 T.C. 1244, 1278 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). Lack of profit objective has also been found where the size of the nonrecourse notes and other terms of the lease are determined without negotiation, Fox v. Commissioner, 80 T.C. 972, 1009 (1983); where the investors or their agents fail to ascertain independent appraisals of the assets involved, Soriano v. Commissioner, supra at 57; and where the general partner and/or promoters have considerable prior experience in structuring tax shelters, Seaman v. Commissioner, 84 T.C. 564, 589 (1985). Petitioner is an educated, sophisticated investor who, at the time he invested, was a highly-paid lawyer looking to shelter income. The promoters were experienced in tax sheltering income but had little knowledge of the plastics industry. *262 The promotional materials emphasized projected tax savings and the price paid for the recyclers was grossly inflated. According to the offering memorandum, Winer, Clearwater's general partner, was neither prohibited from engaging in competitive activity nor compelled to devote any time to the business except to the extent "in his absolute discretion" he deemed necessary. Actually, Winer did very little investigation of the recyclers and the transaction in general. Although the evidence suggests that some correspondence occurred between petitioner, Winer, and Bambara, no positive action was taken by anyone involved with Clearwater regarding the lack of operations by end-users. In passive operations such as leasing, the care exercised in overseeing the performance of duties assigned to third parties is of particular importance. Flowers v. Commissioner, 80 T.C. 914, 932 (1983). Winer was actually unconcerned about the six recyclers because that was not part of the formula. The return on the investment in the recyclers did not come from actually running the machines at all. The testimony and evidence supporting Winer's attempt to monitor the movement and operation *263 of the recyclers is unpersuasive. Such evidence shows more about the level of sophistication of the promoters and their attempts to cover up their true objectives by creating a "paper trail". See Schillinger v. Commissioner, T.C. Memo. 1990-640. Petitioner claims that the Plastics Recycling programs were not promoted by anyone who was experienced with tax shelter income. On the contrary, Grant and Roberts advertised their services as relating to "tax sheltered investments" and Winer had considerable experience in such matters. The Clearwater offering memorandum specifically included the possibility that some of the parties involved in the transaction could be determined to be acting as promoters. Regardless of how reasonable it may be to rely upon one's professional adviser, taxpayers may not hide behind such persons where there is no realistic opportunity to make a profit exclusive of tax benefits. Economically speaking, no investor would put money into a Plastics Recycling program except for the more than 200 percent return from Federal income tax savings. It is quite apparent that Clearwater's actual purpose was to act as a pass-through entity. Taking *264 into account the relevant factors, we conclude that petitioners did not enter into the transactions with Clearwater to lease and sublicense recycling equipment with either a subjective business purpose or an actual and honest objective of making a profit. III. The Safe-Harbor Leasing Rules
The parties have raised the question whether the Plastics Recycling leasing programs literally comply with all of the requirements of section 168(f)(8). Respondent argues that petitioners have not literally complied with the requirements of section 168(f)(8) because F & G has not shown compliance with the minimum investment requirement of 10 percent of the adjusted basis of the property. Sec. 168(f)(8)(B)(ii). Petitioner contends that the minimum investment requirement was always satisfied. Because of our holding that the Clearwater transaction is so lacking in economic substance that it must be disregarded for Federal income tax purposes, we consider it unnecessary and inappropriate for us to decide this further issue. IV. Investment Tax Credit and Business Energy Credit
Petitioners claimed both the investment tax credit and business energy credit on their 1981 Federal income *265 tax return. Both credits purportedly were passed through Clearwater from F & G pursuant to an election made under section 48(d)(1) based on the inflated cost basis of the Sentinel Recyclers. Petitioners are not entitled to the claimed tax credits. Investment tax credits are designed to stimulate the formation of venture capital and are not intended to create a new economy consisting of paper transactions. Beck v. Commissioner, 85 T.C. 557, 579-580 (1985). In the present case, petitioner was not purchasing an interest in a recycler, he was purchasing a tax benefit. Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054, 1067 (1988). V. Additions to Tax
A. Sec. 6653(a) Negligence
Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. An additional amount is added to tax under section 6653(a)(2), equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Petitioner has the burden of proving error in respondent's determination of *266 an addition to tax attributable to negligence. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299; Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions were reasonable in light of his experience, the nature of the investment or business, and his actions in connection with the transactions. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). We have held that a taxpayer may rely upon his adviser regarding matters uniquely within his adviser's field of expertise. Patin v. Commissioner, 88 T.C. 1086, 1130-1131 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), *267 affd. without published opinion sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Petitioner had little knowledge of the recycling business though he does claim experience in investments in natural resources. He relied on the purported value of the Sentinel EPE Recyclers set out in the offering memorandum and on the statements made by the promoters. Petitioner made no attempt to verify the value of the recyclers by seeking the opinion of a reliable independent third party. Rybak v. Commissioner, 91 T.C. 524, 565 (1988). The projected tax benefits to each of the investors were mentioned at three points in the offering memorandum. In 1981 alone, for each $ 50,000 invested, the purchaser was projected to receive $ 86,328 in investment and energy tax credits and $ 39,399 in tax deductions. Petitioners claimed a reduction of taxes in year one equal to approximately $ 2.51 for every dollar invested. In essence, they did not have any of their own net capital invested *268 in the transaction for any extended period of time. More simply, except for a few weeks at the beginning, petitioners never had any money in the deal. A reasonably prudent person would have asked a qualified tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. 827 (1989). The evidence convinces us that petitioner knew that he was buying a program that consisted chiefly of tax benefits and that he participated in the Plastics Recycling programs to earn tax benefits. In claiming those benefits on their tax returns without making further inquiry, petitioners negligently disregarded rules and regulations. Petitioner argues that he relied on the advice of paid experts when deciding to invest and, therefore, exercised due care and was not negligent. His adviser Gordon, who reviewed the promotional materials, was paid to locate investors for the Clearwater transaction. Gordon essentially was in the position of a finder of the tax-oriented transaction. Petitioner will not be relieved of negligence on the basis of his purported employment of Gordon's services. B. Sec. 6659 Valuation Overstatement
Respondent also determined *269 additions to tax under section 6659 for an underpayment attributable to a valuation overstatement. A valuation overstatement is a valuation which exceeds the correct valuation by 150 percent or more. Sec. 6659(c). Here, assets with approximate fair market values of $ 50,000 were valued by petitioners at $ 1,162,666 each. Petitioners' valuations are by definition overstated within the meaning of section 6659. VI. Sec. 6621(c) Tax-Motivated Transactions
The final question here is the interest imposed on tax-motivated transactions by section 6621(c). Prior to the Tax Reform Act of 1986, subsection (c) was designated subsection (d). Pub. L. 99-514, sec. 1511(a), 100 Stat. 2085, 2744. The increased rate of interest is 120 percent of the statutory rate imposed on underpayments if the underpayment exceeds $ 1,000 and is attributable to a tax-motivated transaction (as defined in section 6621(c)(3)). The increased interest is effective only with respect to interest accruing after December 31, 1984, notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published *270 opinion 795 F.2d 1005 (2d Cir. 1986). A tax-motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Further, a tax-motivated transaction includes any sham transaction. Sec. 6621(c)(3)(A)(v). Since we find that the Plastics Recycling leasing program is a sham transaction, by definition the programs are tax motivated. Accordingly, respondent's determination as to the applicable interest rate for deficiencies attributable to tax-motivated transactions is sustained and the increased rate of interest applies for the taxable year in issue. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax year at issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩